RYAN et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. January 6, 1914. On Rehearing, June 3, 1914.)

No. 1975.

1. CRIMINAL LAW (§ 673*)—OFFENSES—STATE AND NATIONAL JURISDICTION—EVIDENCE.

Where certain members of a labor union were indicted for conspiracy to commit a crime against the United States, to wit, the transportation in interstate commerce of dynamite and nitroglycerin in passenger cars and trains, to be used in blowing up buildings and works constructed by "open shop" concerns, and in transporting, aiding, and abetting the transportation of such substances, in violation of the federal statutes, evidence of a chain of explosions throughout the United States, alleged to have occurred by means of dynamite and nitroglycerin so transported, while admissible as circumstantial evidence to support the charges specified in the indictments, should be limited to that purpose; since the offenses involved in the explosions themselves were offenses against, and punishable only under, the laws of the states by the state courts.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1597, 1872–1876; Dec. Dig. § 673.*]

2. CRIMINAL LAW (§ 1167*)—APPEAL—INDICTMENT—DIFFERENT COUNTS—OBJECTIONS.

Where sentences under several counts of an indictment for imprisonment within the term fixed by statute are made to run concurrently, and one of the counts is good, it is immaterial that the others are defective.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3101, 3103–3106; Dec. Dig. § 1167.*]

3. CONSPIRACY (§ 27*)—STATUTORY OFFENSE—ELEMENTS—SUCCESS.

"Conspiracy" to commit a crime against the United States denounced by Rev. St. § 5440 (Cr. Code [Act March 4, 1909, c. 321, 35 Stat. 1096; U. S. Comp. St. Supp. 1911, p. 1600] § 37) is distinguished from the common-law offense, in that it requires for completion and conviction that one or more of the conspirators do any act to effect the object of the conspiracy, and, when so carried forward by any overt act, it constitutes an offense entirely irrespective of its success, or of the ultimate objects sought to be accomplished by conspiring, and the conspiracy so denounced may either intend and be accomplished by one or several acts which complete the offense, or it may be made by the parties a continuing conspiracy for a course of conduct in violation of law to effect its purposes.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 38, 39; Dec. Dig. § 27.*

For other definitions, see Words and Phrases, vol. 2, pp. 1454–1461; vol. 8, p. 7613.]

4 CONSPIRACY (§ 43*)—CONTINUING CONSPIRACY—INDICTMENT—TRANSPORTATION OF EXPLOSIVES—FEDERAL OFFENSES.

An indictment charged that certain defendants named, on December 1, 1906, conspired with others to commit an offense against the United

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

States, to wit, to transport dynamite and nitroglycerin in interstate commerce in vehicles used by common carriers in transporting passengers by land for hire. It then averred that such carriage was not within the exceptions named in Cr. Code, § 232 et seq., and that the conspiracy was continuously in existence and in process of execution throughout all the. time from and after December 1, 1906, and at all of the times mentioned in the indictment, and particularly at the time of the commission of each of the overt acts subsequently set forth. Overt acts were then averred in furtherance of the conspiracy and to carry out its objects, with specifications, alleged to have been committed by the different defendants, the first committed January 20, 1908, and the last August 27, 1911. *Held*, that such indictment averred a continuing conspiracy to commit a continuous offense against the United States in the carriage of prohibited explosives as described.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 79, 80, 84–99; Dec. Dig. § 43.*]

**5.** Conspiracy (§ 28*)—Crimes Against United States—Purpose of Conspiracy.

Where defendants were indicted for conspiracy to commit an offense against the United States, to wit, the transportation of explosives in interstate commerce in passenger cars and trains, in violation of Cr. Code, § 232 et seq., and the carriage of such explosives as charged was made the subject-matter of the conspiracy in any measure, its violation of the federal statutes would establish a basis for a conspiracy to commit an offense against the United States in violation of Cr. Code, § 37, irrespective of the fact that the ultimate purpose of such transportation was to destroy "open shops" steel construction in the various states—an object not within federal cognizance.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 40, 41; Dec. Dig. § 28.*]

**6.** Criminal Law (§ 150*)—Continuing Conspiracy—Limitations.

Where defendants were charged with conspiracy to commit a crime against the United States, to wit, the transportation of prohibited explosives in passenger cars and trains in interstate commerce, in violation of Cr. Code, §§ 37, 232, et seq., and the first overt act was alleged to have occurred January 20, 1908, and the last August 27, 1911, and the indictments were filed February 6, 26, 1912, the prosecution was not barred by limitations.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 274, 275; Dec. Dig. § 150.*]

**7.** Conspiracy (§ 28*)—To Commit Crime—Explosives—Transportation in Interstate Commerce—Statutes—Alteration.

Where defendants were indicted for conspiracy to commit an offense against the United States, to wit, the transportation of dynamite and nitroglycerin in interstate commerce in passenger trains and cars, continuously from and after December 1, 1906, and the first overt act was alleged to have been committed January 20, 1908, and the last August 27, 1911, it was sufficient to sustain a conviction that the carriage of nitroglycerin had been continuously prohibited since Act July 3, 1866, c. 162, § 1, 14 Stat. 81, as preserved in Rev. St. 1874, § 5353 (U. S. Comp. St. 1901, p. 3637), re-enacted, with dynamite expressly named as one of the prohibited explosives in Act May 30, 1908, c. 234, §§ 1, 4, 5, 35 Stat. 554, 555, and Cr. Code, §§ 232, 235; it being immaterial that dynamite was not expressly named in the earlier enactments in force at the date of the inception of the conspiracy, nor was it material that Rev. St. § 5353, had been amended both in respect of additional enumerations and the punishment for the offenses, since such changes could not affect the un-

lawfulness of the undertaking for the carriage of nitroglycerin as averred in the primary conspiracy.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 40, 41; Dec. Dig. § 28.*]

**8. CONSPIRACY (§ 43*)—OFFENSES AGAINST UNITED STATES—TRANSPORTATION OF DYNAMITE AND NITROGLYCERIN—EVIDENCE.**

Where defendants were charged with a continuing conspiracy to transport nitroglycerin and dynamite in passenger trains and cars in interstate commerce, beginning on December 1, 1906, the last overt act having been committed August 27, 1911, it was not necessary for the government to prove extension of the conspiracy to the transportation of dynamite after May 30, 1908, when Rev. St. § 5353, prohibiting the transportation of explosives in interstate commerce, was amended to include dynamite, though such proof was admissible.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 79, 80, 84–99; Dec. Dig. § 43.*]

**9. EXPLOSIVES (§ 2*)—TRANSPORTATION—INTERSTATE COMMERCE—STATUTES—APPLICATION.**

Cr. Code, §§ 232, 235, prohibiting the transportation of nitroglycerin, dynamite, etc., on passenger trains and cars in interstate commerce, were not limited to common carriers, but extended as well to passengers, or persons traveling on trains; the intention being to prohibit the carriage in any manner of the explosives named on passenger trains engaged in interstate commerce, in a "vehicle" thereof carrying passengers for hire, including the carriers, their employés, or any person traveling on such vehicle.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 1; Dec. Dig. § 2.*]

**10. EXPLOSIVES (§ 5*)—TRANSPORTATION IN INTERSTATE COMMERCE—OFFENSES—INDICTMENT.**

Counts of an indictment charging that certain defendants named, unlawfully, knowingly, willfully, and feloniously did then and there transport and carry dynamite and nitroglycerin in a vehicle, to wit, and feloniously alleged in different counts as a passenger car or passenger train, and that other defendants were aiders and abettors therein, sufficiently alleged a violation of Cr. Code, § 232, prohibiting such transportation.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 2; Dec. Dig. § 5.*]

**11. CRIMINAL LAW (§ 619*)—SEPARATE COUNTS IN INDICTMENTS—DIFFERENT OFFENSES—CONSOLIDATION FOR TRIAL.**

Where counts of several indictments charged a conspiracy to commit a crime against the United States, to wit, the transportation of dynamite and nitroglycerin in interstate commerce in passenger cars or trains, and other counts charged defendants either as principals or aiders and abettors with so transporting dynamite and nitroglycerin in interstate commerce in such cars, or trains, such offenses were separate and distinct and not interdependent, nor susceptible of proof by the same evidence, and hence a consolidation of the indictments for trial was properly ordered and was not objectionable as carving several offenses out of one.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1376; Dec. Dig. § 619.*

Consolidation of and trial of indictments together, see note to Dolan v. United States, 69 C. C. A. 287.]

**12. CRIMINAL LAW (§ 195*)—JEOPARDY—FORMER TRIAL FOR SAME OFFENSE.**

Whether a conviction or acquittal on one indictment is a bar to a sentence or conviction on another depends, not on whether a defendant has before been tried for the same act, but whether he has been put in jeopardy for the same offense, since a single act may constitute an of-

fense against two statutes, and, if each requires proof of an additional fact which the other does not, an acquittal or conviction under either will not exempt the defendant from prosecution and punishment under the other.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 382, 383; Dec. Dig. § 195.*]

13. CRIMINAL LAW (§ 1036*)—APPEAL—QUESTIONS NOT RAISED AT TRIAL.
    An objection to the testimony of a witness not raised at the trial cannot be considered on a writ of error.

    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1631–1640, 2639–2641; Dec. Dig. § 1036.*]

14. CRIMINAL LAW (§ 508*)—TESTIMONY OF CODEFENDANT—COMPETENCY.
    Codefendants who had pleaded guilty were competent to testify for the government against their codefendants in the indictment.

    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1099–1123; Dec. Dig. § 508.*]

15. CONSPIRACY (§ 47*)—OFFENSES AGAINST UNITED STATES—INTERSTATE COMMERCE—TRANSPORTATION OF EXPLOSIVES—EVIDENCE.
    In a prosecution for conspiracy to commit a crime against the United States, to wit, the transportation in interstate commerce in passenger trains or cars of nitroglycerin and dynamite in violation of Cr. Code, §§ 37, 232, et seq., and for transporting, aiding, and abetting in such transportation of nitroglycerin and dynamite, evidence *held* sufficient to sustain a conviction of certain of the defendants, and insufficient to sustain a conviction of certain others.

    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. § 47.*]

In Error to the District Court of the United States for the District of Indiana; Albert B. Anderson, Judge.

Frank M. Ryan and twenty-nine others were convicted of conspiracy to commit a crime against the United States, and of transporting, aiding, and abetting the transportation of dynamite and nitroglycerin in interstate commerce in passenger trains and cars between the several states of the United States, and they bring error. Reversed in part, and affirmed in part.

The following are the instructions to the jury, given by Anderson, District Judge:

It is your duty to observe and follow the law as given to you by the court. * * * In order that you may the better understand the case and apply the facts established by the proofs to the law governing it, it is proper that the court should give you a brief explanation or definition of the offenses with which the defendants stand charged.

Section 5440 of the Statutes of the United States provides that if two or more persons conspire to commit any offense against the United States, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to punishment.

By acts of Congress in force during all the times mentioned in this indictment it was made an offense for any person to transport, carry, or convey any dynamite, gunpowder, liquid nitroglycerin, or other explosive, between a place in one state of the United States and a place or places in another state or territory of the United States on any vehicle of any description operated by a common carrier and engaged at the time in the transportation of passengers, unless such explosives so being transported consisted of small arms or ammunition, munitions of war, signal devices intended to promote the safety in operation of said car or train, or samples for laboratory examination.

By an order of consolidation the separate indictments and the various counts thereof have been consolidated into one indictment consisting of 52 counts. These counts are very lengthy, and it is only necessary that I refer at this time to the substance of them. You will have the indictment with you when you come to deliberate upon your verdict, and you can then examine the several counts upon which the defendants are on trial, so far as you may find it necessary to do so.

The counts of this consolidated indictment upon which the defendants are on trial, are as follows:

The first two counts, numbered 15 and 20, charge in different ways a conspiracy to commit an offense against the United States. The remaining counts, numbered 63 to 96 both inclusive, and 113 to 128 both inclusive, each charge one or more of the defendants with the unlawful transportation of liquid nitroglycerin or dynamite from a place in one state to a place or places in other states of the United States in violation of law, and that the other defendants named in the indictment aided and abetted such unlawful transportation of explosives.

Count 15 charges in substance that the defendants on or about the 1st day of December, 1906, did conspire, combine, confederate and agree together and with certain divers other persons whose names are unknown to the grand jurors. to commit an offense against the laws of the United States defined and made punishable by the laws of the United States, to wit, to transport, carry, and convey explosives, to wit, dynamite and nitroglycerin, between a place in one state of the United States and places in other states of the United States, upon and in vehicles then and there used and employed in transporting passengers by land from state to state, said vehicles being then and there engaged in the transportation of passengers for hire, and said vehicles being operated by common carriers in the transportation of passengers by land; that said dynamite and nitroglycerin was not, nor was any part thereof, then and there intended to be small arms or ammunition. or fuses, torpedoes, rockets, or other signal device or devices intended to promote the safety of operation of said or any passenger car or train, nor was the same intended to be a sample for laboratory examination, nor was the same intended to be a munition of war by the defendants; that said conspiracy was continuously in existence throughout all the time from and after the 1st day of December, 1906, and at all times in the indictment mentioned, and particularly at the time of the commission of each of the overt acts in said indictment set forth. This count of the indictment then specifies as overt acts, or acts done in furtherance of the conspiracy and to carry into effect its object and purpose, the writing, mailing, and delivery of certain letters by various defendants, and various acts done by certain of the defendants aside from the actual unlawful transportation of explosives, which acts are charged to have been committed and done in furtherance of the conspiracy and to effect its object and purpose.

Count 20 is substantially the same as count 15, except that the specific places to and from which the explosives were to be illegally transported in pursuance of the conspiracy and the acts of Congress prohibiting such transportation are specifically named.

The next 34 counts, being counts 63 to 96 both inclusive, charge 17 separate and distinct transportations of liquid nitroglycerin in violation of the statute by Ortie E. McManigal, John J. McNamara, and James B. McNamara, or one or more of them, and all the other defendants are charged as aiders and abettors in such violations of the statute. The several acts of transportation are charged in separate counts in two different ways, namely: In 17 of the 34 counts it is charged that a passenger car was the vehicle upon and in which the liquid nitroglycerin was carried from state to state, while in the remaining 17 counts it is charged that the vehicle used was a passenger train.

The remaining 16 counts, being counts 113 to 128 both inclusive, relate to the transportation of dynamite, and charge in separate counts in two different ways, namely, upon a passenger car as the vehicle, and upon a passenger train as the vehicle, eight separate transportations of dynamite in violation of

the statute, by Ortie E. McManigal, John J. McNamara, and James B. Mc-Namara, or one or more of them, and all the other defendants are charged as aiders and abettors.

The charge in the first two counts of this indictment, as consolidated, namely, in counts 15 and 20, is such a conspiracy as is made punishable by section 5440, namely, a conspiracy to commit an offense against the United States, which offense is the transportation of dynamite and nitroglycerin from state to state upon a vehicle operated at the time of such transportation by a common carrier in the transportation of passengers, contrary to the statute of the United States. The questions to be determined upon this branch of the case are: First, was the alleged conspiracy formed by any two or more of the defendants to willfully and unlawfully transport, carry, and convey dynamite and nitroglycerin upon passenger trains or cars operated by a common carrier, from a place in one state to a place or places in another state or states? Second, if such conspiracy was formed, did any or either of the parties thereto, with intent to effect the object of the conspiracy, do either or any of such of the acts charged in the indictment as constituting acts to carry into effect such object? Third, if you find that such conspiracy was formed, and that any one of the parties to the conspiracy intentionally did any act to effect its purpose and object, then the further question for you to determine is: What ones of the defendants now on trial, if any, were parties to the conspiracy either at the time of its formation, or became parties thereto at any time during the continuance of the conspiracy?

A "conspiracy" is formed when two or more persons agree to do an unlawful act; in other words, when they combine to accomplish, by their united action, a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means; and the offense is complete when one or more of the parties so agreeing together does any act to effect the object of the conspiracy. If two or more persons agree together that they will commit a certain offense against the United States, as that of transporting, carrying, and conveying dynamite, and liquid nitroglycerin from one state to another upon passenger trains or cars engaged at the time in the carrying of passengers, contrary to the statutes of the United States, and one or more of the persons so agreeing does any act to effect the object of such agreement, they are all guilty of the offense of conspiracy.

To constitute a "conspiracy" it is not necessary that two or more persons should meet together and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, in words or in writing, state what the unlawful scheme is to be, or the details of the plan or means by which the unlawful combination is to be made effective. It is sufficient if two or more persons, in any manner, or through any contrivance come to a mutual understanding to accomplish the common and unlawful design. Where an unlawful end is sought to be effected, and two or more persons, actuated by a common purpose of accomplishing that end, work together in furtherance of the unlawful scheme, such persons become conspirators, although the part which any one of them is to take in the conspiracy is a subordinate one, or is to be executed at a remote distance from the other conspirators.

In determining the question of the existence of a conspiracy, you will take into consideration the relation of the parties to one another, their personal and business association with each other, and all the facts in evidence that tend to show what transpired between them at or before the time of the alleged combination as well as the acts performed by each party subsequent to such alleged combination in respect to the subject-matter of the alleged conspiracy; and from these facts and circumstances you will determine whether a combination in fact existed, and whether such combination was illegal in its inception, or became illegal at any subsequent time.

A conspiracy is rarely, if ever, proved by positive testimony. When a crime of high magnitude is about to be committed by a combination of individuals, they do not act openly, but covertly and secretly. The purpose of the combination is known only to those who enter into it, and their guilt can generally be proved only by circumstantial evidence. The common design is of the essence of the charge, and this may be made to appear when the defend-

ants steadily pursue the same object, whether acting separately or together, by common or different means, all leading to the same unlawful result.

In determining the question of the formation or existence of the conspiracy, the acts and declarations of the persons accused may, among other circumstances, be considered by you. Statements of one, and in some instances of two or more of the defendants in the absence of the other defendants, and conversations with some of the witnesses on the part of one or more of the defendants in the absence of the others, have been given in evidence. The individual letters and telegrams of different defendants have also been introduced. These declarations, statements, and communications tend to show the existence of the alleged conspiracy and the alleged connection of the persons making the same therewith. Acts or declarations of individual defendants are not to be considered by you as affecting any other defendant, unless you find from the evidence the existence of such conspiracy, that such other defendant was a member thereof, and that such acts were done and such declarations were made in pursuance of the common purpose set out in the indictment and to effectuate the same. The same rule applies to the acts and declarations of persons, if any, who may be shown by the evidence to have joined in the conspiracy, but who are not named as defendants in the indictment.

To constitute the offense of "conspiracy" which is made punishable by the statute, there must be not only the conspiring together by the parties, but the formation of the conspiracy must be followed by an act done by one or more of the parties to the conspiracy to effect its object. So, if you should find that the defendants or some of them conspired together, as charged in the indictment, to commit the offense of unlawfully transporting dynamite and nitroglycerin from state to state upon passenger trains or cars, you will then inquire whether the defendants or either of them did any of the acts charged in the indictment as constituting acts to effect the object of the conspiracy.

The act must be one, you will observe, to effect the object of the conspiracy. It must not be one of a series of acts constituting the agreement, or the conspiring together, but it must be a subsequent, independent act following a completed agreement, and done to carry into effect the object of the combination. Such acts constitute what are known as overt acts in the law of conspiracy.

Various kinds of overt acts are alleged in the two conspiracy counts to have been performed by one or more of the parties to the conspiracy to carry the object of the conspiracy into execution and effect, including correspondence passing between parties to the alleged conspiracy, the procurement by purchase and otherwise of dynamite and nitroglycerin, the purchase of carrying cases and boxes, the renting and procurement of storage places and the storage therein of large quantities of dynamite and nitroglycerin.

The question upon this part of the case is: Were any of these acts done by any or either of the defendants, and, if so, were they acts to carry into effect a conspiracy formed by the defendants to transport, carry, and convey dynamite and nitroglycerin from one state to another upon passenger cars or trains, contrary to the statute of the United States?

If you find that a conspiracy existed, as alleged in the indictment, and that some one or more of the overt acts were committed, as alleged, the question then follows: Were the defendants on trial, or some of them, connected with that conspiracy as parties thereto? Mere passive knowledge of the illegal action of others is not sufficient to show complicitly in the conspiracy. Some active participation is necessary. Co-operation in some form must be shown. There must be intentional participation in the transaction with a view to the furtherance of the common design and purpose. To establish the connection of either of the defendants with the conspiracy, such connection must be shown by facts or circumstances, independent of the declarations of others; that is, by his own acts, conduct, or declarations. And until this fact is thus established he is not bound by the declarations or statements of others. The principle of law and rule of evidence is that when once a conspiracy or combination is established, and a defendant is shown by independent evidence to be a party thereto, then he is bound by the acts, declarations, and statements

of his co-conspirators done and made in furtherance of the conspiracy, because in that event each is deemed to assent to or command what is done by any other in furtherance of the common object. Where a body of men assume the attribute of individuality, whether for commercial business or the commission of a crime, the combination is bound by the acts of one of its members, in carrying out the design.

So, in considering the testimony given as to the acts, declarations, and statements of either one of the defendants when other defendants were not present, you are to understand that that testimony was submitted to you for the purpose of showing in the first instance that there was a conspiracy formed and existing, and that the person or persons making the declarations, statements, or communications were parties to it; that the alleged connection of any one of the defendants with the alleged conspiracy, if any existed, must be shown by facts or circumstances independent of statements of other defendants in his absence; and that, when once that connection is thus shown, then he becomes affected and bound by the declarations and acts of other parties to the conspiracy, if any, made and done in furtherance of the common enterprise and during his connection therewith.

It was not unlawful for the structural iron workers to organize the union to which they belong. It is not unlawful for the defendants to be members of that or any other labor organization. Men have the right to use their combined power through such organizations to advance their interests in any lawful way; but they have no right to use this power in the violation of the law. Organized labor is not on trial here, nor is the right of labor to organize in issue; but members of labor organizations owe the same obedience to the law and are liable to the same punishment for its violation as persons who are not members of such organizations.

The defendants are not on trial for causing the various explosions, and the consequent loss of life and property throughout the United States, shown by the evidence. They are on trial for the offenses charged in the indictment. Evidence of these explosions, together with the facts and circumstances surrounding them, were permitted to go in evidence before you, because they tend to show the community of purpose, the concert of mind and action, which is an essential ingredient of the offenses charged, and they should be considered by you upon that issue alone.

The evidence in this case shows that in August, 1905, there was a controversy between the International Association of Bridge and Structural Iron Workers and the American Bridge Company over the open and closed shop question; that in said month of August, 1905, the International declared a general strike against the American Bridge Company; and that this strike has never been settled. If you find from the evidence that, in order to carry out the purposes of the International, the defendants, or two or more of them, entered into a conspiracy to destroy with dynamite and nitroglycerin the property of the American Bridge Company and other open shop concerns, or the structures which they were erecting in various states of the Union, and if you find that such conspiracy to destroy such property included as a necessary step in the accomplishment of such destruction the unlawful transportation of dynamite and nitroglycerin upon the vehicles of common carriers engaged at the time in the transportation of passengers, from a place in one state to a place or places in another or other states of the United States, and if you further find that such destruction of property was accomplished by explosions of dynamite and nitroglycerin in various places throughout the United States, and that the dynamite and nitroglycerin with which such explosions were produced were as a matter of fact transported from state to state in suit cases and carrying cases upon the vehicles of common carriers, engaged at the time in the carrying of passengers, as averred, then you will be authorized to find that a conspiracy was formed to transport dynamite and nitroglycerin unlawfully, as charged in the indictment.

The indictment charges a continuing conspiracy. The law considers that, whenever any of the co-conspirators does any act to effectuate the common design, the parties to the conspiracy renew, or, to speak more properly, they continue, their agreement, and this agreement is renewed or continued as to

all whenever any one of them does an act in furtherance of their common design. Any person who, after a conspiracy is formed, and who knows of its existence, joins therein by some act intentionally done in furtherance of its object, becomes as much a party thereto from that time on as if he had originally conspired.

The law regards the act of unlawful combination and confederacy as dangerous to the peace of society, and declares that such combination and confederacy of two or more persons to commit crime requires an additional restraint to those provided for the commission of the crime, and makes criminal the conspiracy, with penalties and punishments distinct from those prescribed for the crime which may be the object of the conspiracy. You will readily understand why this is true. A conspiracy becomes powerful and effective in the accomplishment of its illegal purpose, in proportion to the numbers, power, and strength of the combination to effect it. It is also true that, as it involves a number in a lawless enterprise, it is proportionally demoralizing to the well-being and character of the men engaged in it, and, as a consequence, to the safety of the community to which they belong.

I now direct your attention to the counts of the indictment charging violations of the statute of the United States by the unlawful transportation of explosives from state to state. The counts of the consolidated indictment numbered 63 to 96 both inclusive, and 113 to 128 both inclusive, charge the defendants who are on trial with unlawfully, knowingly, willfully, and feloniously aiding and abetting Ortie E. McManigal, James B. McNamara, or John J. McNamara, one or more of them, in the unlawful transportation of explosives from state to state upon passenger cars or passenger trains, in violation of the statute of the United States.

Section 332 of the Criminal Code provides as follows: "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

A person accused is a principal under this statute if he directly commits the crime charged, or aids, abets, counsels, commands, induces, or procures the commission of the crime charged. Aiding, abetting, counseling, commanding, inducing, or procuring are affirmative in their character.

If the said Ortie E. McManigal, or McManigal and James B. McNamara, or McManigal and John J. McNamara, knowingly and purposely, and with the intent charged, did the acts charged against them in the several counts of the consolidated indictment numbered 63 to 96 both inclusive, and 113 to 128 both inclusive, and the defendants who are on trial before you, with the like intent, unlawfully and knowingly did or said something showing their consent to and participation in the said criminal acts of Ortie E. McManigal, James B. McNamara, and John J. McNamara, and contributing to their execution, then you will be justified in finding that such defendants aided and abetted the said McManigal, James B. McNamara, and John J. McNamara in the doing of said acts, and that such defendants are guilty as principals upon such count or counts as you find so proved.

If the defendants, or two or more of them, entered into a conspiracy, as defined in that portion of these instructions relating to that subject, to unlawfully transport dynamite or nitroglycerin as charged, and any one or more of the defendants thereafter, in pursuance of such conspiracy, unlawfully transported such dynamite or nitroglycerin as alleged, you would be justified in finding all the defendants who entered into such conspiracy guilty of all such transportations as took place after they severally entered into said conspiracy.

You may find the defendants guilty upon all of the counts of the indictment upon which they are now upon trial, if you are satisfied beyond a reasonable doubt that the proofs justify it. Or you may find the defendants guilty upon any one or more of the counts of the indictment and not guilty upon the others. You may find any defendant guilty or not guilty, or you may find one or more of them guilty and the others not guilty. Before you can find any of the defendants guilty, you must be satisfied of his guilt in manner and form as charged in some one of the counts of the indictment upon which they are on trial, beyond a reasonable doubt.

Witnesses have been called in the course of the trial who have testified to their own participation in criminal practices, two of whom are under indictment in this court for such practices, and have pleaded guilty to the charges preferred against them. There has been criticism of their testimony, and considerable discussion in argument before you as to the weight to which their testimony is entitled. The court instructs you upon this subject that it is the settled rule in this country that accomplices in the commission of crime are competent witnesses, and that the government has the right to use them as witnesses. It is the duty of the court to admit their testimony, and that of the jury to consider it. It should be received with caution and scrutinized with care. The degree of credit which should be given such testimony is a matter exclusively within the province of the jury. You may as a matter of law convict a person accused of a grave crime upon the uncorroborated testimony of an accomplice. In this case a large amount of evidence has been introduced tending to corroborate the testimony of the witnesses Ortie E. McManigal and Edward Clark, and in determining the weight which you shall give to the testimony of these witnesses you should take into consideration the facts and circumstances in evidence which tend to corroborate them upon the material facts about which they have testified. If you find that they are substantially corroborated by independent evidence with respect to material parts of their testimony, you should then give their entire testimony such weight as in your opinion it deserves.

The witness William J. Burns, while on the witness stand, detailed a conversation that he had with the defendant Hockin in which he made statements to Hockin about the defendant Tveitmoe having been in prison and having a prison record. Such statements made by Burns are not to be considered by you in any way in determining the guilt or innocence of the defendant Tveitmoe as to the charge laid in this indictment.

Some of the defendants have offered evidence before you touching their good character for peace and quietude. Evidence of this sort is competent to be taken into consideration by you in determining the guilt or innocence of such defendants. If such defendants have, in the communities where they live, by their incomings and outgoings among their neighbors built up a good reputation among them for peace and quietude, you should give that fact such weight as you think it entitled to, taking into consideration all the other facts and circumstances established by the evidence.

The burden of proving each defendant guilty, as charged, rests upon the government, and this burden does not shift from it.

The defendants are presumed to be innocent until their guilt in manner and form as charged in some count of the indictment is proved beyond a reasonable doubt. To justify you in returning a verdict of guilty, the evidence should be of such a character as to overcome this presumption of innocence, and to satisfy each one of you of the guilt of the defendants as charged, to the exclusion of every reasonable doubt. If therefore you can reconcile the evidence with any reasonable hypothesis consistent with the innocence of the defendants, it is your duty to do so and in that case find the defendants not guilty. And if, after weighing the proofs in the light of the presumption I have mentioned, you impartially and honestly entertain the belief that the defendants may be innocent of the offenses charged against them, they are entitled to the benefit of that doubt, and you should acquit the defendants. It is not meant by this that the proof should establish their guilt to a certainty, but merely that you should not convict unless from the evidence you find the defendants guilty beyond a reasonable doubt. Speculative notions or possibilities arising upon mere conjecture, not arising or deducible from the proof or from the want of it, should not be confounded with a reasonable doubt. A doubt suggested by the ingenuity of counsel, or by your own ingenuity, not legitimately warranted by the evidence, or the want of it, or one born of a merciful inclination to permit the defendants to escape the penalty of the law, or one prompted by sympathy for them or those connected with them, is not what is meant by a reasonable doubt. A reasonable doubt, as that term is employed in the administration of the criminal law, is an honest, substantial misgiving, generated by the proof or the want of it; that is, such a state

of the proof as fails to convince your judgment or conscience, and satisfy your reason of the guilt of the accused. If the evidence, when carefully examined, weighed, compared, and considered, produces in your minds a settled conviction or belief of the guilt of the defendants—such an abiding conviction as you would be willing to act upon in the most weighty and important affairs of your own life—you may be said to be free from any reasonable doubt, and may find a verdict in accordance with that conviction or belief.

You are the sole judges of the weight and credit to be given to the testimony of the witnesses. You ought fairly and impartially to consider and weigh all the testimony and proofs given in the case. To determine the weight and credibility of the testimony of any witness, you have a right to consider his bias or prejudice, if any is shown, his interest or want of interest in the result of the case, his intelligence and candor, and the knowledge which he is shown to possess touching the matters about which he testifies. You should especially look to the interest which the respective witnesses have in the suit or in its result. Where the witness has a direct, personal interest in the result of the suit, the temptation is strong to color, pervert, or withhold the facts. The law permits the defendants, at their own request, to testify in their behalf. Some of the defendants have availed themselves of this privilege. Their testimony is before you, and you must determine how far it is credible. The deep personal interest which they may have in the result of the suit should be considered by the jury in weighing their evidence, and in determining how far or to what extent, if at all, it is worthy of credit. Some of the defendants have not testified in this cause. You will not consider their failure to testify, nor draw any inference to their prejudice from such omission.

Carefully weigh all the evidence in the case, and from it, under the rules of law which I have given you, determine the guilt or innocence of the defendants. With you, and not with the court, rests the responsibility of finding and determining the facts. The views of the court on questions of fact are not controlling upon you. You have nothing to do with the case except to determine the single question of the guilt or innocence of the defendants. If you should return a verdict of guilty, the measure of punishment to be inflicted upon the defendants is committed to the court. When you retire to deliberate on your verdict, select one of your number to act as a foreman. When you have agreed upon a verdict, let your foreman sign it and then return it into court. Forms of verdict will be furnished for your use.

## The facts are stated as follows by SEAMAN, Circuit Judge:

The plaintiffs in error, 30 in number (hereinafter specifically named), have brought several writs of error, for review of several judgments of conviction, under 52 counts of an indictment charging them (together with other defendants) with violations of criminal statutes of the United States. For the purposes of trial several indictments were consolidated, various counts thereof were eliminated, and the District Court overruled motions entered on behalf of the plaintiffs in error for separate trials and required trial together (inclusive of other defendants) under the consolidated indictment and counts preserved therein. The 52 counts involved in the conviction are of two classes—two counts charging (in substance) the defendants named therein with conspiracy and overt acts to commit an offense against the United States, described in each thereof, and 50 counts charging (in substance) the commission of distinct offenses, of the nature described in the conspiracy counts as the purpose thereof, and by defendants named therein, and that the plaintiffs in error and other defendants named were aiders and abettors in such commission. As referred to in the record, the conspiracy counts are designated as counts 15 and 20, and the others on which the plaintiffs in error were found guilty were counts 63 to 96 inclusive and counts 113 to 128 inclusive.

The averments of "conspiracy count 15" may be summarized as follows: It charges that the plaintiffs in error and other defendants named, on the 1st day of December, 1906, unlawfully, knowingly, willfully, and feloniously did conspire, combine, confederate, and agree together and with certain divers other persons whose names are unknown to the grand jurors, to commit an

offense against the laws of the United States, to wit, to transport, carry, and convey explosives, to wit, dynamite and nitroglycerin, between a place in one state of the United States and a place in another state of the United States, to wit, various places in various states of the United States which are therein named, and divers and sundry places in divers and sundry states unknown to the grand jurors, upon and in vehicles then and there used and employed in transporting passengers by land from state to state, said vehicles being then and there engaged in the transportation of passengers for hire and said vehicles being operated by common carriers in the transportation of passengers by land; that said dynamite and nitroglycerin were not, nor was any part thereof, then and there intended to be small arms or ammunition or fuses, torpedoes, rockets, or other signal devices, or devices intended to promote the safety of operation of said or any passenger car or train; nor were the same intended to be samples for laboratory examination; nor were the same intended to be a munition of war by the defendants. It avers that such transportation was prohibited and made an offense against the law of the United States by act of Congress, and specifies an act of Congress approved July 3, 1866, entitled "An act to regulate the transportation of nitroglycerin or glonoin oil, and other substances therein named," and an act of Congress approved May 30, 1908, entitled "An act to promote the safe transportation in interstate commerce of explosives and other dangerous articles, and to provide penalties for its violation," and an act approved March 4, 1909, entitled "An act to codify, revise and amend the penal laws of the United States." It avers that said conspiracy was continuously in existence throughout all the time from and after the 1st day of December, 1906, and at all times in the indictment mentioned, and particularly at the time of the commission of each of the overt acts in the indictment set forth. It then specifies as overt acts and acts done in furtherance of the conspiracy and to carry into effect its object and purpose, the writing, mailing, and delivery of certain letters by various defendants named, and various acts done by certain other defendants aside from the actual unlawful transportation of explosives, all of which acts are charged to have been committed and done in furtherance of the conspiracy and to effect its purpose and object.

The first overt act so averred is exhibited in a letter purporting to be written by the defendant Ryan and sent to the defendant John J. McNamara, and the last overt act specified is a purported letter from the defendant Pennell to the defendant John J. McNamara, March 4, 1911.

Count 20 is substantially like 15, except that it does not specify the places to and from which the explosives were transported, nor the specific acts of Congress which prohibited such transportation.

The other 50 counts charge 25 distinct transportations of explosives in violation of the statute referred to, by Ortie E. McManigal, John J. McNamara, and James B. McNamara, or one or more of them, and that the plaintiffs in error and other defendants named were aiders and abettors in such violation. Counts 63 to 96 inclusive charge 17 several transportations of liquid nitroglycerin with the transportation described in two different ways, namely: In the counts bearing even numbers it is charged that the vehicle of transportation was a passenger train, while in the counts bearing odd numbers a passenger car is named as the vehicle; and each avers that the vehicle upon which the transportation was made was being used by the common carrier named in transporting passengers and articles by land and was then and there engaged in transporting passengers and articles of commerce by land; and counts 113 to 128 inclusive aver eight distinct transportations of dynamite, with eight counts charging that a passenger car was the vehicle of transportation and the other eight counts charging that a passenger train was the vehicle. In reference to counts 63 to 96 inclusive, the first transportation is charged as occurring April 17, 1910, and the last one as occurring March 18, 1911; and the first transportation of dynamite charged in counts 113 to 128 inclusive is January 22, 1911, and the last one April 7, 1911.

The evidence preserved in the bill of exceptions makes several printed volumes, and it is notable that no error is assigned for reception or rejection of testimony throughout the extended trial, except as to the admissibility of the testimony of two witnesses, McManigal and Clark, who were defendants un-

der the indictment, but testified on behalf of the prosecution. In so far as reference to the evidence becomes needful for consideration of the assignments of error, mention thereof is reserved for the opinion; but the bill of exceptions recites certain facts to be established by the evidence—as quoted in the statement of the case and argument submitted on behalf of the plaintiffs in error—and such recitals may well be incorporated in this statement (for their bearing upon particular evidence discussed in the opinion), as follows:

"It was proven by the government on the trial that in 1905 there was a contest between the American Bridge Company, a concern engaged in the erection of structural iron, and the International Association of Bridge and Structural Iron Workers, of which association all of the defendants except two, that were convicted, were members. The contest between the International Association of Bridge and Structural Iron Workers and the American Bridge Company was over the 'open' and 'closed shop' question; the Bridge Company having declared its purpose to conduct its affairs on the 'open-shop' basis. On the 10th day of August, 1905, the International Association of Bridge and Structural Iron Workers declared a general strike against the American Bridge Company. This strike was approved by the convention of the International Association of Bridge and Structural Iron Workers that was held in September of the same year, and later the strike was extended by the International Association of Bridge and Structural Iron Workers to all 'open shop' concerns in any way connected or affiliated with, or subsidiary to, the American Bridge Company throughout the United States. This strike was never declared off and was in existence at the time of the trial.

"In the early months of the strike it was attended by incidents of picketing, slugging, and rioting where work was being done by 'open shop' concerns; numerous acts of violence in the nature of assaults, and assaults with intent to kill, followed in various places where the work of such concerns was widely distributed throughout the United States.

"In the year 1906 the contest grew in intensity, and dynamite was next used to blow up and destroy buildings and bridges that were being erected by 'open shop' concerns, without reference to whether the firms or corporations that were erecting such buildings and bridges were members of an association or independent contractors. That explosions first took place in the eastern part of the United States and extended from the Atlantic to the Pacific, continuing until the arrest of the McNamaras and McManigal in April, 1911. That almost 100 explosions damaging and destroying buildings and bridges in process of erection, where the work was being done by 'open shop' concerns, took place, and no explosions took place in connection with work of a similar character that was being done by 'closed shop' concerns. That from the 17th day of February, 1908, until the 22d day of April, 1911, 70 of said explosions occurred, of which number 43 were in connection with structural iron work that was being done by members of the National Erectors' Association, of which the American Bridge Company and other companies affiliated with it were members, and 27 explosions occurred in connection with the work of independent concerns in no way connected with the National Erectors' Association or the American Bridge Company, or any of its affiliated organizations; that dynamite was first used, together with fuse and fulminating caps; the fuse generally used in connection with a charge of dynamite was about 50 feet in length, and when lighted the explosion would occur in about half an hour. That nitroglycerin was next brought into use and a clock and battery and necessary attachments provided, to be used together with dynamite and nitroglycerin, constituting what was termed an infernal machine, to be used in connection with the dynamite and nitroglycerin in the destruction of buildings and bridges of 'open shop' concerns. That the clock and battery and necessary attachments from this time forward were used in connection with charges of dynamite and nitroglycerin in the destruction of life and property. That the infernal machines composed of the clock, batteries, caps, and attachments, were so made and arranged that they could be and were set to cause the explosion to take place several hours after it was set, so that the person setting the explosion could be hundreds of miles away when the explosion took place.

"That the headquarters of the International Association of Bridge and Structural Iron Workers at the time that the strike was declared against the American Bridge Company was in Cleveland, Ohio, and continued to be in Cleveland, Ohio, until removed to Indianapolis, Ind., in the early part of 1906. That certain of the defendants were located at Boston and Springfield, in the state of Massachusetts; others in the cities of New York, Syracuse, and Buffalo, in the state of New York; Philadelphia, Scranton, and Pittsburgh in the state of Pennsylvania; Detroit, in the state of Michigan; Cleveland and Cincinnati in the state of Ohio; Muncie and Indianapolis in the state of Indiana; Chicago, Springfield, Mt. Vernon, and Peoria in the state of Illinois; Milwaukee in the state of Wisconsin; Duluth in the state of Minnesota; Omaha in the state of Nebraska; Kansas City and St. Louis in the state of Missouri; Davenport in the state of Iowa; New Orleans in the state of Louisiana; Salt Lake City in the state of Utah; and San Francisco in the state of California. That dynamite and nitroglycerin were transported in passenger cars on passenger trains of common carriers, engaged in the transportation of passengers for hire, into, over, and across the states of Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Ohio, Michigan, Indiana, Illinois, Wisconsin, Minnesota, Kansas, Nebraska, Maryland, Missouri, Montana, Utah, Idaho, Nevada, Washington, Oregon, Colorado, and California, and were used in the destruction of buildings or bridges that were being erected by 'open shop' concerns at places in the states named. That explosions took place in all of the states named and a number of times in some of them. That explosions by dynamite and nitroglycerin were planned to be made in the states of Kentucky, Texas, and Louisiana, in connection with work that was being done in said states on the 'open shop' plan.

."That in connection with the work of destruction of buildings and bridges that were being erected by 'open shop' concerns and in connection with the destruction of material to be used therein and therewith, dynamite and nitroglycerin was purchased and stolen, and various storage places arranged to conveniently store such explosives that were to be used in the destruction of property in the various states where work of 'open shop' concerns was in process of erection, and such explosives were carried and taken on passenger trains from such storage places in the various states to various places in other states where structural iron work was in process of erection. That some of such storage places were located at Muncie and Indianapolis, Ind.; Tiffin, Ohio; Rochester, Pa.; and San Francisco, Cal. That large quantities of dynamite and nitroglycerin were at various times stored in vaults of the Association of Bridge and Structural Iron Workers on the fifth floor of the American Central Life Building, at Indianapolis, Ind., and the basement of said building. That the storage places were so arranged that dynamite and nitroglycerin could be readily obtained and transported from such place of storage to a place in any other state, to be used in the destruction of the property of 'open shop' concerns. That clocks and batteries were purchased by the dozens at various times, at various places throughout the country. That fuse and fulminating caps were also purchased in large quantities, all to be used in connection with the dynamite and nitroglycerin for the destruction of property. That some of such clocks and batteries, fuse and fulminating caps and attachments were also stored in the vaults of the American Central Life Building at Indianapolis, Ind., so that the same would be accessible for immediate use in connection with any explosion desired at any other place in the United States. That to facilitate the transportation and carrying of dynamite and nitroglycerin on passenger trains from such storage places to other places in the United States where work was to be destroyed, suit cases and carrying cases were obtained and purchased in which such dynamite and nitroglycerin, clocks, batteries, fuse caps, and attachments could be conveniently placed and carried by persons going from the place of storage to a place in another state, on passenger trains of common carriers, engaged in the transportation of passengers for hire. That all of said explosions in different parts of the United States were accomplished with the materials, including the nitroglycerin and dynamite, stored in the storage

places above mentioned, and said materials were transported from said storage places to the various places throughout the United States where such explosions occurred, in suit cases and carrying cases by persons traveling upon the passenger trains of common carriers, engaged in the transportation of passengers for hire.

"That four explosions occurred in one night at the same hour in Indianapolis, Ind., and explosions were planned to take place on the same night two hours apart at Omaha, Neb., and Columbus, Ind., and the explosions so planned did occur on the same night and at about the same time, instead of two hours apart, owing to the fact that one clock was defective. One explosion was in connection with the courthouse that was being erected at Omaha, Neb., by Caldwell & Drake, and the other explosion was in connection with the plant of the same firm at Columbus, Ind., which firm at that time was an independent concern, engaged in conducting its business upon the 'open shop' plan. That the infernal machines composed of the clocks, batteries, and necessary attachments, and the nitroglycerin with which the explosions at the courthouse in Omaha, Neb., and the plant of Caldwell & Drake at Columbus, Ind., were taken from the storage places of said materials above set forth. That the Times Building at Los Angeles was destroyed by the use of dynamite on the 1st day of October, 1910, and 21 people killed, and immediately after the happening of this event arrangements were made to have an explosion in the eastern part of the United States as an 'echo' in the East of what had occurred at Los Angeles. That it was contemplated and planned prior to the arrest of the McNamaras and McManigal for seven or eight explosions to take place in different parts of the country, widely separated, on the same night. That all the dynamite and nitroglycerin except the dynamite that was stolen, the batteries, clocks, caps, fuse and attachments, suit cases and carrying cases, as well as the expense and work of carrying the explosives and articles to be used in connection therewith, including the expense incident to the stealing of dynamite, were paid out of the funds of the International Association, and these funds were drawn from the Association upon checks signed by the secretary-treasurer, John J. McNamara, and by the president, Frank M. Ryan."

The assignments of error which are relied upon for reversal are thus summarized, in substance, in the brief for plaintiffs in error:

(1) For error in overruling demurrers and motions to quash filed by plaintiffs in error; that the conspiracy counts are bad in substance and the carriage counts are insufficient in the same particulars.

(2) For error in consolidating the indictments for trial and in overruling the motion to vacate such order.

(3) For error in permitting the defendant McManigal "to be employed by the government as a witness against the plaintiffs in error."

(4) For like error in permitting the defendant Clark to be so employed as a witness.

(5) For error in overruling motions made in the nature of demurrers to the evidence at the close of the government's case in chief and for overruling like motion made at the close of the whole case.

(6) For error in refusing to require the government to elect at the close of the entire case upon which charge of conspiracy it would further proceed in the trial; also, for error in refusing to order an election between the conspiracy counts and the aiding and abetting counts; also, for failure to direct the jury to ignore the conspiracy counts as requested.

(7) For error in each of the following instructions given to the jury: "The indictment charges a continuing conspiracy. The law considers that whenever any of the co-conspirators does any act to effectuate the common design the parties to the conspiracy renew, or, to speak more properly, they continue, their agreement, and this agreement is renewed or continued as to all whenever any one of them does any act in furtherance of their common design. Any person who, after a conspiracy is formed, and who knows of its existence, joins therein by some act intentionally done in furtherance of its object, becomes as much a party thereto from that time on as if he had originally conspired."

And the following, to wit: "If you find from the evidence that, in order to carry out the purposes of the International, the defendants, or two or more of them, entered into a conspiracy to destroy with dynamite and nitroglycerin the property of the American Bridge Company and other open shop concerns, or the structures which they were erecting in various states of the Union, and if you find that such conspiracy to destroy such property included as a necessary step in the accomplishment of such destruction the unlawful transportation of dynamite and nitroglycerin upon the vehicles of common carriers engaged at the time in the transportation of passengers from a place in one state to a place or places in another or other states of the United States, and if you further find that such destruction of property was accomplished by explosions of dynamite and nitroglycerin in various places throughout the United States, and that the dynamite and nitroglycerin with which such explosions were produced were as a matter of fact transported from state to state in suit cases and carrying cases upon the vehicles of common carriers, engaged at the time in the carrying of passengers, as averred, then you will be authorized to find that a conspiracy was formed to transport dynamite and nitroglycerin unlawfully, as charged in the indictment."

The following is a list of the plaintiffs in error, together with their respective places of residence and relation to the International Association of Bridge and Structural Iron Workers, as described in the brief submitted on their behalf, together with the terms of imprisonment imposed respectively:

(1) Frank M. Ryan resided in Chicago and was president of the International Association. Sentence: 19 months imprisonment on counts 15 and 20 concurrently; 13 months on transportation counts 63 and 64; 13 months on counts 65 and 66; 13 months on counts 67 and 68; 13 months on counts 69 and 70; and 13 months on counts 71 to 96 and counts 113 to 128; making the aggregate imprisonment 7 years. (2) John H. Barry resided at St. Louis, Mo., and was second vice president of the association. Sentence: Aggregate imprisonment 4 years. (3) Eugene A. Clancy resided in San Francisco, Cal., and was vice president of the association. Sentence: On "conspiracy" counts, imprisonment 20 months, and on "carriage" counts, imprisonment 52 months. (4) Michael J. Young resided in Boston, Mass., and was a member of the executive board of the International Association. Sentence: On "conspiracy" counts, 20 months; on "carriage" counts, 52 months; aggregate imprisonment, 6 years. (5) Olaf A. Tvietmoe resided in San Francisco, Cal., but did not belong to the International Association. Sentence: On "conspiracy" counts, 20 months; on "transportation" counts, 52 months; aggregate imprisonment, 6 years. (6) Frank C. Webb resided in Hoboken, N. J., was a member of the executive board of the association, and held official relations to his local union. Sentence: on "conspiracy" counts, 20 months; on "transportation" counts, 52 months; aggregate imprisonment, 6 years. (7) Philip A. Cooley resided in New Orleans, La., and was a member of the executive board. Sentence: On "conspiracy" counts, 20 months; on "transportation" counts, 52 months; aggregate imprisonment, 6 years. (8) John T. Butler resided in Buffalo, N. Y. Prior to the alleged conspiracy he had been president of the association and was second vice president thereof from September, 1909, to September, 1911. Sentence: On "conspiracy" counts, 20 months; on "transportation" counts, 52 months; aggregate imprisonment, 6 years. (9) J. E. Munsey resided in Salt Lake City, Utah, and was financial secretary and business agent to Local No. 37 of the association. Sentence: On "conspiracy" counts, 20 months; on "transportation" counts, 52 months; aggregate imprisonment, 6 years. (10) Peter J. Smith resided in Cleveland, Ohio, and was business agent to Local No. 17. Sentence: Aggregate imprisonment, 4 years. (11) Charles N. Beum resided in Minneapolis, Minn., and was for a time member of the executive board. Sentence: Aggregate imprisonment, 3 years. (12) Henry W. Legleitner resided in Pittsburgh, Pa., and was a member of the executive board. Sentence: Aggregate imprisonment, 3 years. (13) Edward Smythe resided in Peoria, Ill., and was financial secretary of Local No. 113. Sentence: Aggregate imprisonment, 3 years. (14) George Anderson resided in Cleveland, Ohio, and was a member of Local No. 17. Sentence: Aggregate imprisonment, 3 years. (15) Ernest G. W. Basey resided in Indianapolis, Ind.,

and was financial secretary and business agent of Local No. 33. Sentence: Aggregate imprisonment, 3 years. (16) W. Bert Brown resided in Kansas City, Mo., and was financial secretary of Local No. 10. Sentence: Aggregate imprisonment, 3 years. (17) Wm. J. McCain resided in Kansas City, Mo., and was business agent of Local No. 16. Sentence: Aggregate imprisonment, 3 years. (18) Paul J. Morrin resided in St. Louis, Mo., and was business agent of Local No. 18 and president of the Local at one time, and was organizer for the International Association. Sentence: Aggregate imprisonment, 3 years. (19) William E. Reddin resided in Milwaukee, Wis., and was president, financial secretary, and business agent of Local No. 8. Sentence: Aggregate imprisonment, 3 years. (20) Michael J. Cunnane resided in Philadelphia, Pa., and was business agent of Local No. 13. Sentence: Aggregate imprisonment, 3 years. (21) Michael J. Hannon resided in Scranton, Pa., and was financial secretary and business agent of Local No. 17. Sentence: Aggregate imprisonment, 3 years. (22) Murray L. Pennell resided in Springfield, Ill., and was president of Local No. 46; also financial secretary for a time. Sentence: Aggregate imprisonment, 3 years. (23) Frank J. Higgins resided in Boston, Mass., was president of Local No. 7 and also a special organizer for the International Association. Sentence: Aggregate imprisonment, 2 years and 2 days. (24) Frank K. Painter resided in Omaha, Neb., and was president of Local No. 21 and business agent thereof. Sentence: Aggregate imprisonment, 2 years and 2 days. (25) Richard H. Houlihan resided in Chicago, Ill., and was financial secretary of Local No. 1. Sentence: Aggregate imprisonment, 2 years and 2 days. (26) Fred Sherman resided in Indianapolis, Ind., and was president of Local No. 2. Sentence: Aggregate imprisonment, 2 years and 2 days. (27) William Bernhardt resided in Cincinnati, Ohio, and was financial secretary of Local No. 44. Sentence: 1 year and 1 day. (28) James E. Ray resided in Peoria, Ill., and was president of Local No. 112. Sentence: Aggregate imprisonment, 2 years and 2 days. (29) William Shupe resided in Chicago, Ill., and was business agent of Local No. 1. Sentence: Aggregate imprisonment, 1 year and 1 day. (30) Fred J. Mooney resided in Duluth, Minn., and was financial secretary of Local No. 33. Sentence: Aggregate imprisonment, 1 year and 1 day.

E. N. Zoline, of Chicago, Ill., and Chester H. Krum, of St. Louis, Mo., for plaintiffs in error.

Charles W. Miller, of Indianapolis, Ind., for the United States.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). These writs of error are brought by the plaintiffs in error respectively for review of the several verdicts and judgments against them, rendered upon their trial together (inclusive of other defendants), as joined in an indictment embracing numerous counts. Each judgment rests on the same counts in the indictment (with like verdicts of conviction in each instance), which are 52 in number, charging violations of criminal statutes of the United States. In two of the counts, designated in the record as counts 15 and 20, the plaintiffs in error and other defendants are charged with conspiracy (in violation of section 5440, R. S., preserved in section 37 of the Criminal Code) to commit an offense against the United States in the transportation and carriage of explosives interstate, in violation of statutes of the United States as described; and in 50 thereof designated as counts 63 to 96 inclusive and counts 113 to 128 inclusive, commission of distinct offenses in such transportation and carriage of explosives by defendants named is averred and described, together with charges that the plaintiffs in error were aiders and abettors in each of these alleged

violations of the statute—aggregating 25 offenses averred, with each stated in two counts in succession, varied only in description of the vehicle employed. Thus, the charges are, not only necessarily but in truth, limited to offenses against the United States, which are alone within federal cognizance, and if the primary contentions on behalf of all the plaintiffs in error are tenable, as stated by counsel at the outset of their argument for reversal, it is plain that none of the convictions can be upheld. As there stated they contend:

"That neither in the indictments, nor in the evidence adduced under them, can there be found the faintest suggestion of a case of which a national court can have jurisdiction, and that there cannot be found in this record, anywhere, warrant for the claim that it shows a conspiracy to carry prohibited explosives between states in the specific manner essential to the operation of the statute"; and that "the record does not show a carriage of such explosives for which they were responsible as aiders or abettors of him who made such carriage."

Other important questions are raised by the assignments of error and elaborately discussed in the arguments of counsel (both printed and oral), but the arguments for and against reversal are mainly directed to the above propositions in one and another of their various phases; and it may well be mentioned, by way of further premise for discussion of the questions of law presented and the distinction to be observed for their solution—particularly in reference to the contention of insufficient evidence to authorize submission of the case to the jury—that a leading consideration for reversal is forcefully urged throughout the argument, in the effect either given to or caused by the uncontroverted array of facts (as recited in the bill of exceptions) proving the chain of outrages perpetrated in the long course of the nation-wide strike in evidence, inaugurated and supported by the International Association of Bridge and Structural Iron Workers. The propositions thereupon are, in substance: That the systematic destruction of property through the conveyance and use of explosives —involving instances of murderous destruction of human life—in many places and various states, and the facts proving or tending to prove criminal means employed therein (as set forth), in the service and at the expense of the above-mentioned International Association, which tend alone to prove commission of criminal acts against the states respectively or conspiracy to that end (not within federal jurisdiction) operated to confuse the issues under the indictments, so that this line of evidence was accepted and treated by the jury as sufficient for conviction of the plaintiffs in error, in the absence of proof to charge them with the federal offenses averred in the several counts of the indictment.

[1] The admissibility of the facts referred to, as circumstantial evidence which may tend to support the charges against them in connection with other facts introduced (as hereinafter pointed out), is unquestionable if not in effect conceded, but it was and is obvious that it became needful (as recognized by the trial court) to limit consideration of such facts to their legitimate purpose, and that any crimes imputable thereunder to parties accused in the case at bar could not serve as independent evidence for their conviction, nor in any measure authorize

conviction without proof of complicity in the particular offenses charged in the indictment. Under our systems of criminal jurisdiction the requirement is elementary that federal cognizance is strictly limited to violations of the federal criminal statutes; and offenses against the state, either statutory or common law, are within the exclusive jurisdiction of the state courts respectively.

The assignments of error which are relied upon and pressed in the argument raise important questions of law for determination under these writs, and we proceed in their consideration in accord with their arrangement by counsel. All are applicable alike to each of the plaintiffs in error, except the special assignments under each of the writs of want of evidence for submission of the case to the jury as against such plaintiff in error; and for the reason that due exceptions are preserved and error is assigned and relied upon for insufficiency of the evidence as against any of the plaintiffs in error, consideration of its tenability becomes needful, as a general contention of important bearing on the issues. Review of the testimony under these assignments has required diligent examination through the several volumes of transcript of record, but the aids to that end furnished by counsel respectively in their voluminous printed statements and briefs with constant references to the record, have fairly minimized the extent of labor and time thus involved. And it may justly be remarked, both in reference to the briefs and the oral arguments (for which liberal extensions of time were granted as requested), that each has impressed us to be clearly and strictly devoted to an instructive presentation of the various propositions of law and of the authorities upon which their solution must hinge.

The questions raised which are equally applicable to all of the plaintiffs in error are each fundamental as presented, and are so taken up severally for primary consideration.

## Challenges of the So-Called Conspiracy Counts.

The sufficiency of each and all counts of the indictment involved in these convictions was challenged by demurrers, motions to quash, and motions in arrest of judgment, and we understand that each of the questions discussed thereupon arises for decision.

[2] The two conspiracy counts (designated as counts 15 and 20) are alike in substance, differing only in the omission from count 20 of specifications contained in count 15: (a) As to particular places to and from which the explosives were to be carried, and (b) of the particular acts of Congress which prohibited such carriage. As the sentences under both counts were made concurrent, for imprisonment within the term fixed by the statute, in all instances material to the inquiry, the special objection raised to count 20, for want of the specification of places above mentioned as contained in count 15, if tenable, would not constitute reversible error; but we believe the objection to be unsupported by the authorities as a substantial defect, and proceed accordingly to consideration of the various contentions of defect in both counts.

These counts are founded on section 5440, Revised Statutes—now section 37 of the Criminal Code—providing punishment for conspiracy

"to commit any offense against the United States." Each charges in apt terms that the plaintiffs in error and other defendants named, on December 1, 1906, conspired with others and entered into a conspiracy to commit an offense against the laws of the United States, "to wit, to transport, carry, and convey explosives, to wit, dynamite and nitroglycerin, between a place in one state of the United States and a place in another state of the United States, upon and in vehicles then and there used and employed in transporting passengers by land between a place in one state of the United States and places in other states of the United States; said vehicles aforesaid being then and there engaged in the transportation of passengers for hire" and "operated by common carriers in the transportation of passengers by land." It properly avers that such carriage was not within exceptions named in the statute, and then further avers:

"That said conspiracy was continuously in existence and in the process of execution throughout all of the time from and after the said 1st day of December, 1906, and at all of the times in this indictment mentioned, and particularly at the time of the commission of each of the overt acts in this indictment hereinafter set forth."

Overt acts are averred in furtherance of the conspiracy and to carry into effect its object and purpose, with specifications thereof in numerous letters written and sent by various defendants named, and various acts done by other defendants, apart from the actual unlawful transportation of explosives. The first overt act thus specified is a letter from the defendant (plaintiff in error) Ryan to the defendant John J. McNamara, bearing date January 20, 1908, and the last act is specified as committed August 27, 1911.

The indictment embracing count 15 was filed February 6, 1912, and that embracing count 20 was filed February 26, 1912.

In the argument the contentions of substantial defects in these counts are summarized in effect: (1) That conspiracy to commit an offense is not properly averred (with or without "enumeration of places, covering a period of six years"), because "there is no such offense as the promiscuous carriage of prohibited explosives between enumerated points in different states"; (2) that the counts can neither be upheld "as stating a conspiracy to commit various or many offenses," nor "as stating many conspiracies in one count"; (3) that the statute referred to as defining the offense to be committed had long been repealed, and none of the existing statutes were applicable to the charges; (4) that there can be no "continuing offense" of conspiracy under the statute (section 5440); and (5) that each count "shows on its face that it is barred by limitation."

We believe these propositions coalesce in so far that they may be considered together, and that none of them recognizes the rightful definition of the unlawful conspiracy averred, nor of the violation of statute which was to be committed and carried out in its execution.

[3] The authorities concur, as we understand their import, in these definitions of the conspiracy denounced by section 5440, R. S. (as preserved in section 37 of the Criminal Code), namely: That it is distinguishable from the common-law offense of conspiracy, in that

it requires for completion and conviction that "one or more of such parties do any act to effect the object of 'the conspiracy"; that, when so carried forward by any overt act, it constitutes an offense entirely irrespective, either of its success or of the ultimate objects sought to be accomplished by conspiring "to commit any offense against the United States"; that "liability for conspiracy is not taken away by its success, that is, by the accomplishment of the substantive offense at which the conspiracy aims"; and that the conspiracy so denounced may either intend and be accomplished by one or several acts which complete the offense, or it may be made by the parties a continuing conspiracy for a course of conduct in violation of law to effect its purposes. For citations in support of the propositions thus stated it is deemed sufficient to refer to these recent decisions: United States v. Kissel, 218 U. S. 601, 605, 31 Sup. Ct. 124, 54 L. Ed. 1168; United States v. Barber, 219 U. S. 72, 31 Sup. Ct. 209, 55 L. Ed. 99; Hyde v. United States, 225 U. S. 347, 367, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Brown v. Elliott, 225 U. S. 392, 400, 32 Sup. Ct. 812, 56 L. Ed. 1136; Heike v. United States, 227 U. S. 131, 144, 33 Sup. Ct. 226, 57 L. Ed. 450; Breese v. United States, 203 Fed. 824, 827, 122 C. C. A. 142 (C. C. A., 4th Circuit). It is uncontroverted that a long line of prior cases, both in the Supreme Court and in subordinate courts, uphold the above proposition of a continuing conspiracy as applicable under section 5440; but the contention is pressed throughout the argument, not only that the above mentioned Kissel decision is inapplicable to the present inquiry, but that Hyde v. United States, supra, "determined for the first time that section 5440 is not a conspiracy statute at all," for the reason that the opinion states and upholds the doctrine that a conspiracy thereunder "cannot alone constitute the offense. It needs the addition of the overt act. Such act is something more, therefore, than evidence of a conspiracy. It constitutes execution, or part execution of the conspiracy, and all incur guilt by it, or rather complete their guilt by it." That this ruling appears to disaffirm the definition stated in U. S. v. Britton, 108 U. S. 199, 204, 2 Sup. Ct. 531, 534 (27 L. Ed. 698), and other cases in line therewith, that the "offense does not consist of both the conspiracy and the acts done to effect the object of the conspiracy," is undoubted; but we believe the contention predicated thereon to be untenable, in the light both of the entire trend of authorities above referred to interpreting the statute to embrace continuing conspiracies, and of express reaffirmance of such interpretation, as subsequently stated in the opinion.

The propositions in support of the contention are, in substance: That there can be no continuing offense of conspiracy under section 5440, within the interpretation thereof settled by the Hyde Case; that such interpretation is controlling, as the latest ruling of the Supreme Court, for the reason that the jurisdictional question there presented for decision rests thereon; and that the further statement in the opinion (and ruling accordingly) that the case presented a continuing conspiracy and offense within the statute, so that it was not barred by limitation as contended, must be disregarded, either as obiter or as rest-

216 F.—3

ing on a misapprehension of the ruling in the Kissel Case, cited therefor, wherein the conspiracy involved was in violation of the so-called Sherman Act, which required no overt acts for completion of the offense. True it is that the above-quoted definition of the relation of the overt act for completion of the offense is stated in the opinion by way of support for the ruling that commission of overt acts in the District of Columbia afforded ground for indictment and trial there for the conspiracy, although the conspiracy was entered into in California; but we understand the theory ultimately stated in the prevailing opinion to be that such action of the conspirators carried the conspiracy into the district, within authorities referred to both at common law and under the statute, and thus established constructive presence of all the conspirators therein. In any view, however, of the logic of that portion of the opinion and force of the ruling upon the question of venue for the conspiracy, we believe it to be unmistakable, not only that it was not intended to disturb the long-settled interpretation of the statute as applicable to a continuing conspiracy and continuous offenses thereunder, but that the immediate ruling upon the merits of the case is decisive against the present contention that this pre-existing doctrine was set aside. It was both necessarily and in express terms reaffirmed in such subsequent ruling which directly involved that doctrine. Moreover, it was likewise reaffirmed in the contemporaneous case of Brown v. Elliott, supra, and by the subsequent unanimous decision of the court in Heike v. United States, supra. The distinction above referred to of the conspiracy involved in the Kissel Case does not, as we believe, detract from its authority for definition of and ruling upon a conspiracy which is made a continuous "partnership in criminal purposes."

[4, 5] Both conspiracy counts, therefore, plainly aver a continuing conspiracy to commit continuous "offense against the United States," in the carriage of prohibited explosives as described. The contention that the dominating conspiracy, presumptive under the averments and established by the evidence, was the destructive purpose for which the explosives and their incidental carriage were to be used—an object not within federal cognizance—is entirely beside the issue. If the carriage, as averred, was made the subject-matter of the conspiracy in any measure, its violation of the federal statute would establish a conspiracy within the terms of section 5440, irrespective of any purpose involved in such prohibited carriage. So, neither the fact nor the magnitude of the primary conspiracy, however disclosed, can make the indictment defective or defeat liability thereunder.

The case of Pettibone v. United States, 148 U. S. 197, 202, 13 Sup. Ct. 542, 37 L. Ed. 419, which is cited in a supplemental brief as decisive in favor of the further contention that the charge of conspiracy must be interpreted as one for commission of offenses against the states, and not against the federal statutes, we believe to be plainly distinguishable, both in its facts and ruling, and inapplicable to the present inquiry.

[6-8] The objection that the statute of limitation bars prosecution under the averments is clearly untenable under the above-mentioned doctrine and authorities; and the further several objections to the

force and applicability of the statutes which are relied on to render unlawful the carriage of explosives as described in the counts, do not impress us to merit extended discussion. It is sufficient for the present inquiry that such carriage of nitroglycerin has been continuously prohibited from, and since the Act of July 3, 1866, 14 Stat. L. 81, as preserved in section 5353, R. S. 1874, and re-enacted—with dynamite expressly named as one of the prohibited explosives—in the Act of May 30, 1908 (part 1, 35 Stat. L. 554) and in the Criminal Code, sections 232-235 (part 1, 35 Stat. L. 1134). Neither the fact that dynamite was not expressly named in the earlier enactments, in force at the date averred as the inception of the conspiracy, nor the fact of changes made in the act of 1908 and the Criminal Code of 1909, both in respect of additional enumerations and of punishment for the offenses, can affect the unlawfulness of the undertaking for carriage of nitroglycerin, as averred, in the primary conspiracy. For evidence of such conspiracy it was not needful to prove extention thereof to the carriage of dynamite after May 30, 1908; but we believe such proof could well be authorized under the averments of either count.

[9] The contention that these enactments were intended to be applicable to the common carriers only, and not to passengers or persons traveling on the trains, is untenable, as we believe, both under the language of each of the provisions and in view of their obvious purpose, to prohibit carriage in any manner of the explosives named on a passenger train engaged in interstate commerce, in a "vehicle" thereof "carrying passengers for hire." That each is applicable alike to possible cases of such carriage endangering the lives of passengers, either by common carriers or employés thereof, or by any person traveling on such vehicle, cannot be doubted; and it is equally clear, as we believe, that a conspiracy "to commit any offense" thereunder is denounced alike, whether it extends to a single offense or to a course of many offenses.

We are of opinion, therefore, that all the challenges directed against the above-mentioned counts must be overruled.

### As to Sufficiency and Joinder of the So-Called "Carriage Counts."

[10] The numerous counts, referred to as "carriage counts," are all challenged for insufficiency. They are of two general classes, one charging carriages of nitroglycerin and the other carriages of dynamite. Counts 63 to 96 inclusive relate to nitroglycerin and counts 113 to 128 inclusive relate to dynamite. They are arranged in pairs throughout the array of counts, so that each pair of counts in succession charges in effect one offense, with the averments varied only in description of the vehicle of carriage, and are so treated in each of the sentences imposed under the verdicts. The first-mentioned class of counts, 34 in number, charge 17 distinct offenses, the first committed April 17, 1910, and the last March 18, 1911; and the other class, 16 in number, charge 8 offenses, the first on January 22, 1911, and the last on April 7, 1911. Thus both classes are brought within the scope of the above-cited sections of the Criminal Code, which became operative January 1, 1910. In each of these counts it is averred, in apt terms, that defendants named "unlawfully, knowingly, willfully, and

feloniously, did then and there transport" and carry the prohibited explosive described, in a vehicle plainly described within the language of the statute, and that the plaintiffs in error (and other defendants named) were aiders and abettors therein.

We believe the foregoing summary of the character of the counts and their averments, not only meets each of the several contentions of their insufficiency, as independent counts charging commission of the statutory offense, but furnishes from the record ' complete answer to the objections so interposed, and that each thereof must be overruled as not well founded.

[11] Another contention of error in respect to these counts, however, is far more serious, both in its import and in the propositions and authorities called to attention for its support—namely, that joinder of such charges with the conspiracy counts and convictions accordingly, was .unauthorized. The premise and propositions advanced in the strong argument for reversal on this ground are thus formulated: That such joinder presented for trial and conviction "a charge of conspiracy coupled with a .charge of the consummation of the act to do which the conspiracy was devised; the doing of the consummated act, as far as the plaintiffs in error were concerned, upon a theory of aiding and abetting expressly averred in the carriage counts, and the only suggestion of aiding and abetting .was found in the fact of conspiracy to violate the law, evidenced by the designs of the alleged conspirators"; that all the counts, if not otherwise bad, "are interdependent" and "the case must fall upon either hypothesis of the government"; that "if there was a continuing conspiracy there was only one offense," and, "if there was a conspiracy separable from the actual carriage, the consolidation was wholly improper because of the different rule of evidence applicable to the respective counts." And again: That "the record shows that out of the same state of facts, in the same jurisdiction, a multitude of so-called separate offenses were carved; plaintiffs in error were unlawfully tried for these offenses, were convicted and have been punished for them all—thus having been tried and punished many times for the same offense, in violation of" the fifth amendment of the Constitution.

We are of opinion that each of these propositions is untenable, for the reason that each is predicated on the erroneous interpretation of the statutory offense of conspiracy hereinbefore considered and overruled, under the consensus of authorities. They ignore the established distinction between the conspiracy, as a separate statutory offense, and the commission of other offenses, either by the conspirators or by other persons in execution of the purposes of the conspiracy; that the one offense consists of the inhibited combination of the conspirators to commit the unlawful acts, together with any "act to effect the object" thereof, so that conviction neither requires nor involves commission of any offense for which the conspiracy was formed—in no measure depends either on accomplishment or failure of its purposes—but requires only averment and proof of any overt act to carry the conspiracy into effect; and that offenses committed in violation of the other statute (whether in execution of the conspiracy or otherwise) constitute distinct offenses, not involved in conviction under

the conspiracy statute. Thus the counts for conspiracy on the one hand, and those for aiding and abetting unlawful carriage of explosives on the other hand, cannot rightly be defined as "interdependent," nor were both charges either proved or provable by the same evidence, as contended; and the further contention, that commission of the offenses averred in the last-mentioned counts was relied upon and involved for conviction under the conspiracy counts, is unsupported by the averments in such counts, wherein neither of such commissions of offense is set forth in the specification of overt acts, so that no question arises whether their averment therein as overt acts would affect the rule above stated as to the independent nature of the other counts. Undoubtedly, the evidence introduced in support of the conspiracy charge may well serve as evidence tending to support the charges of aiding and abetting commission of the offenses averred in the other counts; but this coincidence in part gives no support to either contention of identity of the offenses charged, or of identity of the evidence involved for conviction. It is obvious that proof to convict of commission of the unlawful carriages, as aiders and abettors, must extend beyond the requirements for proof of the conspiracy.

For the definition and distinction of these two classes of statutory offense, the decisions of the Supreme Court heretofore referred to must be accepted as controlling, and the numerous cases cited from other jurisdictions are inapplicable, in the light of such controlling precedents. Two citations of early federal opinions, which may be pertinent in one aspect of the argument, are relied upon and well deserve mention. U. S. v. McKee, 4 Dill. 128, 26 Fed. Cas. No. 15,688, and Ex parte Joyce, 13 Fed. Cas. No. 7556. The opinion in the McKee Case (in 1877) is by Mr. Justice Miller, sitting at the circuit, with Judge Dillon concurring therein, overruling a demurrer interposed to defenses set up in a civil suit, brought by the United States to recover double the amount of taxes of which the government had been defrauded by the unlawful removal of whisky from distilleries. The defense in question averred prior indictment and conviction "for the same offenses." It is stated in the opinion that the indictment so pleaded was for conspiracy to defraud the government out of the taxes due, "and that in pursuit of that conspiracy other" conspirators "did unlawfully remove said whisky"; and that in the civil case the defendant "is charged with aiding and abetting the same removal, and, if convicted, will be punished for the same removals." It then holds that joining the conspiracy as described "was aiding and abetting the removal which was effected by means of the conspiracy"; and that, "if the specific acts of removal" in suit "are the same which were proved in the indictment, the former judgment and indictment is a bar to the present action." In the Joyce Case, petitioner was released on writ of habeas corpus from further imprisonment under convictions upon four counts of an indictment—three charging violations of the revenue law and the fourth charging conspiracy to defraud the United States, and the opinion is by Judge Krekel, in the same year and in the District Court of the same district of the foregoing decision. Its rulings are substantially stated in accord with the theory of Mr. Justice Miller's opinion, although about a month prior in date, so that three

eminent jurists appear to have concurred, at that date, in such theory of identity in the charges involved for decision. For consideration of both opinions we assume (without so ruling) that both cases presented a state of facts which would make them applicable to the present inquiry, but thus viewed, we are constrained to believe that their doctrine is inconsistent with the rule now established by the tribunal of ultimate authority, as hereinbefore stated.

[12] The above-recited contentions, therefore, of improper joinder and double punishment through such joinder of the two classes of counts must be overruled, in conformity with the rule and authorities referred to, together with the statutory provision for joinder of charges (section 1024, R. S. [U. S. Comp. St. 1901, p. 720]) and authorities applicable thereto. Logan v. United States, 144 U. S. 263, 295, 12 Sup. Ct. 617, 36 L. Ed. 429; Pointer v. United States, 151 U. S. 396, 400, 403, 14 Sup. Ct. 410, 38 L. Ed. 208; Williams v. United States, 168 U. S. 382, 390, 18 Sup. Ct. 92, 42 L. Ed. 509; Burton v. United States, 202 U. S. 344, 358, 377, 378, 26 Sup. Ct. 688, 50 L. Ed. 1057. As further authority against the contention of double punishment, the opinion in Gavieres v. United States, 220 U. S. 338, 340, 342, 31 Sup. Ct. 421, 55 L. Ed. 489 (and authorities cited), is well in point. It quotes and approves the test stated in Morey v. Commonwealth, 108 Mass. 433, 434, for ascertaining whether offenses are identical, which plainly answers the present contention, as follows:

"A conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other. The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

The various assignments of error for consolidation of the indictments and counts thereof and for denial of motions for separate trials, must be overruled under this line of authorities. Not only was the course thus adopted by the trial court within the exercise of judicial discretion, but we are impressed with the view that no other course could justly have been directed.

### Is Error Well Assigned for Reception of the Testimony of McManigal and Clark, Codefendants?

[13, 14] Both of these witnesses were called on the part of the government, and McManigal committed most of the offenses charged in the unlawful carriage counts and directly caused most of the destruction in evidence by use of explosives so conveyed by him. Both were codefendants with plaintiffs in error in the consolidated indictment, and both pleaded guilty to all the counts—McManigal before commencement of the trial and Clark before any evidence was introduced. When tendered as witnesses for the prosecution, the only objection to the competency of either was thus stated: "That he is a codefendant with defendants on the record," and by reason thereof "is not a competent witness against any of the defendants." Another objection is now

urged, namely, that it does not appear of record that either witness was called "at his own request"; but this is without force (if otherwise material) for the reason that it was not raised at the trial, when any defect (if defect there were in such omission) could have been brought to the attention of the trial court or corrected. The right of any defendant, either to refuse or refrain from testifying under the charge, or to testify "at his own request, but not otherwise," is not only secured by statute, but well recognized and undisputed. The assignment of error, however, rests alone on the objection thus preserved to his competency as a witness against his codefendant in the indictment, and it must be overruled on the authority of Benson v. United States, 146 U. S. 325, 329, 333, 13 Sup. Ct. 60, 36 L. Ed. 991, which is deemed decisive of such competency. In reference to the essentials of corroboration of testimony so received, the rule is well settled and will be considered in reviewing the evidence, pursuant to the various assignments for insufficiency to support submission of the issues.

## Instructions to the Jury.

The instructions given by the court on submission of the issues to the jury are preserved as an entirety in the bill of exceptions (Record, vol. 4, pp. 3677–3692), and no exceptions appear thereto, aside from the two paragraphs quoted in the statement of facts which precedes this opinion. Thus review is neither sought nor authorized of other instructions so submitted, but reference to the context of the paragraphs challenged is authorized, as of course, and we have examined the entire charge in that view. Its precision, correctness, and thoroughness in the instructions which are unchallenged are notable, in effect as follows: That the various essential propositions of law involve in the issues are well pointed out and defined in clear language, not open to doubt of their meaning for application to the evidence; that limitation of the issues to the specific charges of the indictment was directed in plain terms, alike unmistakable in definition of the issues; that all references to the evidence were not only dispassionate, but exceedingly fair throughout the charge; that the jury were carefully instructed and cautioned as to the sole purpose and bearing of the evidence relating to the International Association and destruction of property in the long course of the strike referred to, and that neither that association nor the rights of "organized labor" were on trial; and they were further charged, in express terms, that "the defendants are not on trial for causing the various explosions, and the consequent loss of life and property throughout the United States" in evidence.

In the light of instructions thus given, we are of opinion that the criticisms urged against the two paragraphs in question are unfounded, and that error is not well assigned thereupon.

### As to the General Motion to Direct Acquittal "Upon the Whole Case" in Evidence.

[15] The contentions in support of this challenge are of the utmost importance for just solution and are strongly pressed, with frank recognition of the enormity of criminal offenses, not of federal cognizance, which are in evidence. For basic grounds of the argument

against the sufficiency of proof for submission to the jury to convict any of the plaintiffs in error of an offense of federal cognizance, the propositions heretofore considered and overruled as challenges of both classes of counts in the indictment—the one for conspiracy and the other for aiding and abetting the unlawful carriage of explosives— are relied upon, together with the further proposition that the entire array of evidence in the case is directed and tends alone to prove commission of offenses against the several states. The contentions that either or both classes of counts in the indictment are insufficient do not require further discussion for the present inquiry, but the last-mentioned proposition is nevertheless of vital concern and demands careful analysis and consideration of the evidence. It rests on these broad contentions as framed in the course of the argument: (1) That "the whole case depends upon the conspiracy indictment"; (2) that "there was no evidence that the conspiracy, if there was one, was the conspiracy laid in the indictment," namely, "to transport, interstate, between 25 different places in different states, dynamite and nitroglycerin" in passenger cars as averred; (3) that the testimony of the defendant McManigal, if it be assumed that it tended to prove both classes of averment—both of such conspiracy and of aiding and abetting commission of the transportation offenses by any of the plaintiffs in error, which is denied—is without corroboration to charge any plaintiff in error with commission of the offense averred.

Undoubtedly, the charges of aiding and abetting hinge, mainly if not entirely, on the evidence introduced to prove conspiracy to that end and that the plaintiffs in error were conspirators therein, so that the first-mentioned contention may justly be conceded for the present inquiry, and we proceed to consideration of the other two which coalesce in large measure. It is plain that submission of the case to the jury was erroneous, if both are well founded.

In the brief of argument for these contentions, it is stated that they are made "upon a record which is utterly wanting in proof of essential and necessary facts," and that "nothing can more fully or clearly state the whole case than the recital of the bill of exceptions, which, of course, omits everything exculpatory of the plaintiffs in error." It thereupon quotes the general recitals referred to, making nearly six printed pages of excerpt (as set forth in the statement which precedes this opinion). The facts thus recited as "proven by the government on the trial" may be mentioned in part as follows:

The nature of the contest between the International Association of Bridge and Structural Iron Workers, of which "all of the defendants, except two, that were convicted, were members," and the American Bridge Company and of the ensuing general strike declared and supported by the Association "throughout the United States," extending from 1905 continuously down to "the time of the trial," is described. In the early months it was attended by "numerous acts of violence" in various places, and commencing in 1906 dynamite was brought into use "to blow up and destroy buildings and bridges that were being erected by 'open shop' concerns," and such explosions started in the eastern part of the country and "extended from the Atlantic to the Pacific" in many places. This course continued "until the arrest of

the McNamaras and McManigal in April, 1911." Almost 100 explosions thus occurred, "damaging and destroying buildings and bridges in process of erection where the work was being done by 'open shop' concerns." And "no explosions took place in connection with work of a similar character that was being done by 'closed shop' concerns." From February 17, 1908, until April 22, 1911, 70 of such explosions occurred, 43 of which were in connection with work either of the National Erectors' Association or American Bridge Company and affiliated concerns, and 27 of the explosions occurred in connection with the work of independent concerns in no way connected with either thereof. Dynamite was first used together with fuse and fulminating caps, the fuse being generally about 50 feet in length "and when lighted the explosion would occur in about half an hour." Nitroglycerin was next brought into use provided with a clock and battery and attachments "to be used together with dynamite and nitroglycerin, constituting what was termed an infernal machine, to be used in connection with the dynamite and nitroglycerin in the destruction of buildings and bridges of 'open shop' concerns"; and "from this time forward the clock and battery was used in connection with charges of dynamite and nitroglycerin in the destruction of life and property." These infernal machines "were so made and arranged that they could be and were set to cause the explosion to take place several hours after it was set, so that the person setting the explosion could be hundreds of miles away when the explosion took place." The headquarters of the International Association was at the outset in Cleveland, Ohio, but was removed to Indianapolis, Ind., early in 1906, and there remained. The various places in which the several defendants were located are mentioned in various states. The dynamite and nitroglycerin which were used for the explosions mentioned "were transported in passenger cars on passenger trains of common carriers engaged in the transportation of passengers for hire into and over and across" various states named. Explosions took place "in all of the states named and a number of times in some of them" and "were planned to be made" in other states named. In connection with this work of destruction, "dynamite and nitroglycerin was purchased and stolen and various storage places arranged to conveniently store such explosives that were to be used in the destruction of property in the various states" referred to; and "such explosives were carried and taken on passenger trains from such storage places in the various states to various places in the other states where structural iron work was in process of erection," and the various locations are named. "Large quantities of dynamite and nitroglycerin were at various times stored in vaults of the Association" in Indianapolis and also in the basement of the building. These storage places "were so arranged that dynamite and nitroglycerin could be readily obtained and transported from such place of storage" to other places for their use in destruction of property, also clocks and batteries, as described, and fuse and fulminating caps, as well, in large quantities, "all to be used in connection with the dynamite and nitroglycerin for the destruction of property"; and some thereof were stored in the vaults of the Association at Indianapolis, "so that the same would be accessible for immediate use in connection with any explosion desired at any

other place in the United States." For the purpose of carrying such explosives, "suit cases and carrying cases were obtained and purchased, in which such dynamite and nitroglycerin, clocks, batteries, fuses, caps and attachments could be conveniently placed and carried by persons going from a place of storage to a place in another state on passenger trains of common carriers, etc." All the explosions mentioned "were accomplished with the materials, including the nitroglycerin and dynamite," so stored, and were transported "from said storage place to the various places throughout the United States, where such explosions occurred, in suit cases and carrying cases by persons traveling upon the passenger trains of common carriers," etc. "Four explosions occurred in one night at the same hour in Indianapolis," and "explosions were planned to take place on the same night two hours apart at Omaha, Neb., and Columbus, Ind., and the explosions so planned did occur on the same night at about the same time, instead of two hours apart, owing to the fact that one clock was defective. The explosions referred to at Omaha and Columbus were all 'open shop' concerns, and the infernal machines used therein were taken from the storage places of said materials above set forth." The "Times Building at Los Angeles was destroyed by the use of dynamite" on October 1, 1910, and 21 persons killed, "and immediately after the happening of this event arrangements were made to have an explosion in the eastern part of the United States, as an echo in the East of what had occurred at Los Angeles." Prior to "the arrest of the McNamaras and McManigal," seven or eight explosions were planned "to take place in different parts of the country, widely separated, on the same night." All the expenses of dynamite and nitroglycerin, "except the dynamite that was stolen, the batteries, clocks, caps, fuse and attachments, suit cases and carrying cases, as well as the expense and work of carrying the explosives and articles to be used in connection therewith, including the expense incident to the stealing of dynamite, were paid out of the funds of the International Association, and these funds were drawn from the association upon checks signed by the secretary-treasurer, John J. McNamara, and by the president, Frank M. Ryan," plaintiff in error.

In reference to these facts the brief states:

"Gruesome as this recital is, as evidencing a reprehensible series of individual acts depending upon matters of state cognizance, there is nothing in it even suggestive of a matter of national cognizance, of which a national court could have jurisdiction. There is nothing tending to prove the charge laid in the indictments" as consolidated and tried.

We infer from the argument that the contention of entire want of force in these facts, as tending to prove either one or both classes of averment—the one of conspiracy to transport the explosives as averred and the other of complicity of the plaintiffs in error, or any thereof, in the actual transportation so proven—is predicated on the twofold theories asserted throughout the discussion on behalf of the plaintiffs in error, in effect: (a) That any conspiracy thus appearing so differs in its scope and purposes, that it cannot tend to prove the averred conspiracy; and (b) "that any persons could have conspired to do what the indictment says these plaintiffs agreed to do was in itself an im-

possibility and the allegation is absurd." So, it is argued: "There was no proof of such a conspiracy and not a suspicion of such proof." Both of these theories have entered into consideration and are in effect overruled in reference to objections raised to the indictment, and we believe them to be alike untenable upon the present inquiry. That other facts than those above recited must appear in evidence for support of the charge of conspiracy under the indictment, as against the various plaintiffs in error, is unquestionable; but we have no doubt of the admissibility and probative force of the facts recited as circumstantial evidence tending to prove the averred conspiracy, when connecting facts and circumstances to that end are in evidence. Nor do we perceive any warrant for the contention that the averred conspiracy was either impossible of creation or execution, or inconsistent in any sense with the primary conspiracy which may be deduced from the above recitals.

The general challenge for insufficiency, therefore, must rest on failure of evidence of connecting facts to authorize submission of the charges, and the solution must be obtained through examination of the mass of additional evidence preserved in the record. Although the rule upon writs of error places the burden on the plaintiffs in error to support their assignments, it is obviously impracticable for counsel on their behalf to furnish aid in such research for this inquiry, except in a negative way, by calling attention to alleged infirmities in the testimony. Proceeding in that view, the further evidence pertinent to the inquiry has been carefully examined—aided therein by helpful references in the brief submitted by counsel for the government—and we are impressed with no doubt of its adequacy for overruling this general challenge upon both of its branches above stated. The great extent and wide range of evidence applicable to the inquiry render it difficult to attempt, within reasonable limits, any useful specification of probative facts so appearing, and the numerous specific references to and mention of such facts—as required for consideration of each of the individual challenges for like cause and hereinafter reviewed—are equally pertinent for this general inquiry and will suffice for details, so that we are content to mention here the leading features and tendency of the additional evidence which authorized the submission. Such evidence is applicable as well to each of the individual motions to direct acquittal, except in respect of the vital inquiry as to identification of the plaintiffs in error respectively as parties to the averred conspiracy and offenses committed thereunder.

The premises of fact which are settled by the above recitals—laying out of view the far more serious course of crimes which appear in evidence as committed pursuant to the primary conspiracy—may be recapitulated as follows: Executive officers, members, and agents of the International Association of Bridge and Structural Iron Workers, were engaged in a joint undertaking—rightly charged as a conspiracy—to use dynamite, nitroglycerin, and so-called "infernal machines," in required quantities, at many places in various states, either in succession or simultaneously as planned, through agents not residing in such places. For such use these explosives were provided and stored at various storage places, arranged for the purpose in various states, to

be carried by the agents for use as required, in special carrying cases provided for the purpose, to distant places with needful dispatch and secrecy, so that interstate carriage on passenger cars as averred in the counts, was made necessary for use thereof in other places and states as constantly ordered by the conspirators; and all expenses for such explosives and for their storage and carriage as described "were paid out of the funds of the International Association," and "drawn upon checks signed by the secretary-treasurer, John J. McNamara, and by the president, Frank M. Ryan" (plaintiff in error). In 25 instances proven such interstate carriages were performed by an agent, as averred in the counts respectively, for designated use of the explosives. Furthermore, the twofold fact of conspiracy for use of the explosives, and that the defendants McManigal, both McNamaras and Hockin were conspirators therein is, in substance, conceded in the argument to be established by the evidence; and it is undisputed that the evidence proves the defendant Edwin Clark to be another member of such conspiracy.

These basic facts directly bearing upon the issues are followed up with connecting evidence of the following nature: Written correspondence on the part of many of the plaintiffs in error, both between one and another thereof and with other defendants, inclusive of the above-mentioned conspirators, together with letters from one and another of such conceded conspirators to one of the plaintiffs in error and to other defendants, properly identified, constitute one volume of printed record; and these letters furnish manifold evidence, not only of understanding between the correspondents of the purposes of the primary conspiracy, but many thereof convey information or directions for use of the explosives, while others advise of destruction which has occurred, and each points unerringly not only to the understanding that the agency therein was that of the conspirators, but as well to the necessary step in its performance of transporting the explosives held for such use. This line of evidence clearly tends to prove and may well be deemed convincing of the fact of conspiracy on the part of many, if not all, of the correspondents; and many, if not all, of the uses of explosives therein referred to are established by other evidence to have occurred, together with direct evidence of carriage of explosives for such use, as charged.

The president of the association was the plaintiff in error Ryan, and John J. McNamara was its secretary and treasurer, up to his conviction and sentence (for crimes committed in California) in 1911, thus covering the entire period embraced in the present charges. Under its organization provision was made for monthly reports to show all expenditures of association funds and publication thereof in the official journal. On December 13, 1905, Ryan wrote to McNamara, that it was best to discontinue such publication "while this trouble is on," and in February ensuing the official magazine published a notice by the "executive board" of the association that publication of such reports would cease "during our strike" and until further instructions. The last letter in evidence, written by John J. McNamara, April 13, 1911—

the day after his arrest and the concurrent arrest of McManigal—may well be mentioned in this connection both for its general bearing and for its statements that "some organization matters must be surrounded with the utmost secrecy," and that, "even after something has been accomplished, experience has proven the least said about it the better"; also a circular, entitled "Important Warning," dated June 16, 1911, signed jointly by plaintiff in error Ryan and by Hockin (who was one of the original plaintiffs in error and the undisputed director of the explosions), and sent to the officers and members of the association, in effect cautioning all members to keep silent on all actions of the officers thereof of which they may have information, in the view that "traitors will be more active than ever at this particular time." The executive board of the association constituted the managing directors of its policy and affairs, and one of their duties was examination and audit of all expenditures for payment out of its funds. President Ryan and several other plaintiffs in error (as hereinafter specified) constituted this board and held frequent meetings at the headquarters in Indianapolis (aside from their respective visits to "fields of operation"), throughout the period during which explosives were purchased, stored, and transported as proven, in performance of their various duties and purposes. We do not understand that minutes of their meetings are in evidence showing their action upon any expenditures during this period, nor does it appear whether record of the fact or items was preserved in any form other than the checks therefor; but the fact of payments from such funds of the association (with many of the checks in evidence) for all expenditures involved herein, is established, as recited in the bill of exceptions, together with the fact that checks therefor were signed by Ryan and McNamara. While it is true that Ryan testifies for the defense, in substance, that he signed such checks in blank, leaving them with McNamara for use in payments, and was unacquainted with the items or purpose entering therein when completed, his credibility in such version was for determination by the jury. So the question was plainly presented for their determination, whether Ryan and other members of the executive board performed their duties in respect of such expenditures and were advised of their purpose, as a just deduction from all circumstances in evidence pertinent to that inquiry. Plainly the absence of direct proof of affirmative action by the board cannot foreclose an inference of such action, in the light of the above-mentioned order in reference to expenditures made during the "trouble," together with another official statement of proceedings of the board (produced from a publication in its recognized official organ, "Bridgemen's Magazine" of April, 1910), embracing various matters ruled upon, wherein the published minutes, signed by the secretary-treasurer, conclude as follows:

"The items set forth above do not include all the matters considered by the executive board. It goes without saying that many questions were presented and acted upon that are not deemed of sufficient importance to be recorded in these columns. Such items, however, were of vital interest to the persons directly interested and were of necessity presented to and considered by the executive board."

Many witnesses, who appear to be disinterested, testify to facts and circumstances which tend strongly in support of one and the other class of charges under the indictment, but specific mention of their testimony is not deemed needful. One feature of circumstantial evidence is brought out by the testimony and justly pressed for consideration, as tending to prove the conspiracy in all its phases, namely: That use of explosives for destruction of property as described embraced exclusively "open shop concerns" and was continuous and systematic from the commencement of such course up to the time of the above-mentioned arrest of the McNamaras and McManigal, and then ceased throughout the country.

The chief direct testimony in the record, however, is that of the defendant Ortie E. McManigal, wihch is plainly subject to the challenge of its independent force, by way of proving the charges, under his relations of record and confessed course of criminality, and thus requires special mention and reference, as well, to the extraordinary array of corroborating evidence furnished in support thereof, as an indispensable requisite for its consideration as proof against the plaintiffs in error. His testimony is remarkable, both for its story of wicked conduct in a systematic course of crimes committed by himself, from the time of his alleged employment in 1907 by Herbert S. Hockin (one of the plaintiffs in error, who has withdrawn his writ) to carry out the objects of the conspiracy, down to the time of his arrest at Detroit, April 12, 1911, and for its directness and completeness upon both classes of issue, inclusive of identification of several of the plaintiffs in error as actors in the conspiracy. In each of the 25 transactions of unlawful carriage of explosives charged in these counts, he testified that the explosives were taken by himself from the storage places, and were personally carried on passenger cars in trains as described, for use in destroying property, and were so used by him. In each instance the transactions are set forth with abundant details of date, places and incidents (on direct and cross-examination), which afford the utmost of reasonable opportunity to test their verity; and the extent and comprehensiveness of the evidence introduced in corroboration of this testimony impress us to be not only extraordinary, but thorough for all requirements to authorize its submission to the jury, under proper instructions for testing its force and credibility, upon which no error is assigned. The elements of corroborative evidence are numerous, including records of telegraph, telephone, railroad, and express companies, hotel registers in many places, testimony of trainmen and many other witnesses for identification of the various trips and carriages, letters and many exhibits of explosives and "infernal machines," identified as taken from various storage places disclosed by McManigal and other witnesses.

We are of opinion, therefore, that the general challenge for insufficiency of evidence must be overruled; that support for the charge of conspiracy, to say the least, by no means rests on the testimony of McManigal; and that no error appears in submission of his testimony for consideration by the jury.

## As to the Sufficiency of Evidence to Charge the Individual Plaintiffs in Error Respectively.

The error assigned on behalf of each plaintiff in error for want of evidence to justify submission of the case as against him presents the single further inquiry in each instance, whether evidence appears—direct, circumstantial, or both—which tends to establish his engagement in the conspiracy and his aiding and abetting the taking and carriage of explosives as charged in the indictment; evidence of the existence of such conspiracy must be treated as settled by the foregoing rulings. This crucial question of law in each case differs fundamentally from the far more complicated question of fact for exclusive determination by the jury when it arises for submission, whether the evidence proves the charge of his complicity in the offenses beyond reasonable doubt. While it is the duty of the court—both for submission at the trial and for review thereof on these assignments—to determine whether substantial evidence is presented which tends to prove such charge, and rule accordingly for or against submission thereof as an issue of fact, it is not within the province of this court to weigh or determine the sufficiency of the proof otherwise than above stated. If competent and substantial evidence appears in the record plainly tending to prove commission of the offenses by the plaintiffs in error respectively, the assignment of error in such case must be overruled as settled by the jury within their elementary province. The test in each case for this remaining inquiry is thus resolved into one of identification with the conspiracy heretofore defined, in such manner that his understanding of the procurement and storage of explosives for use in its objects, requiring conveyance thereof by the users to various distant places designated by the conspirators for explosions to ensue, may reasonably be inferred. So, the contentions in respect of various plaintiffs in error of their distant locations from other parties and of improbability (as well as denials) of acquaintance with the particular unlawful carriages charged, or with McManigal, are without force in view of the nation-wide conspiracy and purposes in evidence, if their active and continuous engagement therein is proven.

We proceed, therefore, with the inquest in each case as to the evidence presented in the line above indicated, and state our conclusions and rulings thereupon in reference to the plaintiffs in error respectively, as named and specified below:

1. Plaintiff in error Frank M. Ryan:

This plaintiff in error was president of the assocation and of its executive board and was active manager and leader of the contest and policies carried on throughout the years of the strike and destructive explosions in evidence. Letters written and received by him at various stages of the contest clearly tend to prove his familiarity with and management of the long course of destroying "open shop" structures, however guarded in expression. He was at the headquarters of the association for supervision of operations periodically, usually two or three days each month, uniformly attended the meetings there of the executive board, and made frequent visits to the field of activities. As previously stated, Ryan wrote the

letter suggesting that reports of expenditures be discontinued while "our trouble is on," and presided at the board meeting adopting such course; and presided as well at all subsequent meetings referred to wherein all expenditures for allowance out of association funds "were of necessity presented." He signed all of the checks in evidence (as recited) for payments of expenditures for purchase, storage and conveyance of explosives. One of Ryan's letters (January 20, 1908) to McNamara in reference to obnoxious work in course of erection at Clinton, Iowa, was followed up by destruction of the bridge (February 17, 1908) by explosives carried there and applied by McManigal (under direction of plaintiff in error Hockin) and the expense was paid through a check signed by Ryan. Letters received by Ryan from the defendant Edward Clark, who resided at Cincinnati, one of the places of bitter contest, and was an active manager in that field, bring home to the former plain information of "needs" for "other kinds of methods," which were carried out in explosions; and many other letters in evidence, both from and to him, however disguised in terms, may well authorize an inference of his complete understanding of and complicity in the explosions, both in plans and execution. Edward Clark testifies of a meeting with Ryan in Cincinnati to examine the work of "open shop" concerns, and that Ryan called his attention to a location where a "shot could be placed to advantage." McManigal testifies of meetings and conversations with him in reference to explosions caused by the witness, on two occasions, at least, and corroborative testimony appears for one of these interviews. Ryan's own testimony admits visits and conferences tending to confirm the foregoing inferences of complicity.

The assignments on behalf of plaintiff in error Ryan are overruled and the judgment against him must be affirmed.

2. Plaintiff in error Eugene A. Clancy:

This plaintiff in error, as stated by his counsel, was first vice president of the International Association and a member of the executive board, resided at San Francisco and was business agent of "Local No. 38," of that place. And they also rightly state that he "does not appear to have been a voluminous letter writer, so we have little in the shape of 'admissions' from him." His participation in the meetings and action of the executive board is proven, so that his familiarity with the expenditures designated under the heading of "Emergency Fund" may justly be inferred. His activity in direction of the primary conspiracy, both on the Pacific Coast and elsewhere in other fields of explosions, plainly appears. Several of his letters are in evidence which are clearly indicative of his familiarity with the explosions and their purposes. Witness Mary C. Dye, bookkeeper for the asociation, testifies of a conversation with Clancy at the headquarters wherein he was inquiring for the defendant John J. McNamara, and when informed by the witness that he had gone away and had taken with him a check for $700, which might indicate where he was as Clancy knew of the drawing of such an amount by him, that Clancy replied, "that the information did not enlighten him any, because the executive board had given McNamara the right to use the money without explaining

at the time the use of it." Also, that Clancy remained at the office for several days until the return of McNamara.

McManigal testifies that on July 15, 1910, on his return from one of the explosions he had caused, he met the McNamara brothers at the headquarters in Indianapolis and James B. McNamara informed him that he was "getting ready to go to the coast"; that he was then shown a telegram from Clancy from the coast asking whether "Jim had left for the coast or not"; that John J. McNamara informed the witness that the witness when he went to the coast was to "go to Clancy for directions; he will make you acquainted with the bunch out there and you are to work under his instructions." The witness further testifies that on this occasion John J. McNamara made arrangements for the witness to cause certain explosions in the East, saying:

"I want an echo in the East, so that when the explosions come off in the West there will be an echo in the East and it will keep them guessing."

Subsequently the witness went to San Francisco after his destruction of the Llewellyn Iron Works at Los Angeles, December 25, 1910 (which was stated by the witness to be directed by McNamara as a "Christmas present" to Tveitmoe, the "old man of the coast"), and at San Francisco he met Clancy, who stated to him, "I was expecting the Llewellyn Iron Works explosion." He also mentioned a previous meeting between them at Chicago in which the plaintiff in error Hockin participated. At the later interview the witness states that Clancy said to him:

"When you go back to Indianapolis you tell John J. McNamara that he had better look out for the Salt Lake guy; I think there is a leak there"—referring to the plaintiff in error Munsey who resided at Salt Lake City.

He also asked the witness if he knew Mike Young (referring to plaintiff in error Young), and on his answering that he did know him, Clancy said: "Young told me about you." This testimony of Mc-Manigal is corroborated by many circumstances. Furthermore, on June 3, 1910, Clancy wrote to John J. McNamara from Los Angeles in reference to the Llewellyn Iron Works and other obstacles there, closing with this significant message: "Now, Joe, what I want here is Hockin"—Hockin being the director of the dynamiting work. On July 12, 1910, Clancy wrote to McNamara to have the plaintiff in error Barry sent to Los Angeles; that "Barry was badly needed." Clancy's telegram above mentioned to J. J. McNamara, inquiring whether Jim had left for the coast, is in evidence. Clancy telegraphed from Boston to the San Francisco headquarters to "clean house," immediately after reading of the Times explosion at Los Angeles, manifestly referring to removal of all traces of connection with the explosions. Much other evidence appears which tends to show his complete understanding of and part in the conspiracy.

The assignments on behalf of plaintiff in error Clancy are overruled and the judgment against him must be affirmed.

3. Plaintiff in error Michael J. Young:

This plaintiff in error resided at Boston, Mass., and was active in performance of duties in connection with the International Associa-

216 F.—4

tion, attending the meetings of the Board during all of the allowances of expenditures and was in charge, as well, of all operations carried on in Massachusetts. Letters written and received by him clearly tend to show his complicity in explosions in evidence which occurred at Boston, Springfield, Fall River, and Somerset. And the testimony of McManigal, which is strongly corroborated in many of its particulars in reference thereto, constitutes direct proof of complicity and directions by this plaintiff in error for such explosions. We believe evidence of his complicity by no means rests alone on McManigal's testimony, as his counsel contends, but that the circumstantial evidence is exceedingly strong against him.

The assignments on behalf of plaintiff in error Young are overruled and the judgment against him must be affirmed.

4. Plaintiff in error Frank C. Webb:

This plaintiff in error resided in Hoboken, N. J., and was an active member of the association and one of the executive board. Within his jurisdiction ten explosions are in evidence, and numerous letters written by him and other letters received by him furnish abundant evidence in connection with undisputed circumstances tending to prove his complicity in these explosions. He is directly identified therewith by the testimony of McManigal. We believe the proof was ample for submission of the issues to the jury.

The assignments on behalf of plaintiff in error Webb are overruled and the judgment against him must be affirmed.

5. Plaintiff in error Phillip A. Cooley:

This plaintiff in error was an active member of the executive board, who attended its meetings and, alike with the other members, was chargeable with notice of the expenditures in connection with the explosives used; and his activity in reference to the explosions and their purpose appears from many circumstances in evidence and from many letters from him to McNamara and other conspirators, which are replete with unmistakable references both to plans for carrying them out and of execution thereof. He resided at New Orleans but his activity in various places is in evidence.

The assignments on behalf of plaintiff in error Cooley are overruled and the judgment against him must be affirmed.

6. Plaintiff in error John T. Butler:

This plaintiff in error lived in Buffalo, was second vice president of the association, and a member of the executive board throughout the period in question. His name was appended to the notice of discontinuance of publication of expenditures and his attendance upon the meetings of the Board appears and his knowledge of the expenditures and their purpose may justly be inferred. His particular jurisdiction embraced the territory, covered by several explosions in evidence at Buffalo and one at Erie, Pa., and his activity therein appears from numerous letters written by him to John J. McNamara and others in evidence, containing references which leave no doubt of his complete acquaintance with these explosions as executions of the conspiracy. His testimony in the case leads to like inference.

The assignments on behalf of plaintiff in error Butler are overruled and the judgment against him must be affirmed.

7. Plaintiff in error John H. Barry:

This plaintiff in error resided at St. Louis, was business agent of "Local No. 18" and was a member of the executive board up to September, 1909. His name was appended to the magazine notice referred to for withholding publication of expenditures and he assisted personally in auditing the books of the association during the period of his service on the board, which covered a large portion of the expenditures described in the recitals. Explosions are in evidence to the number of about 75 during the period of his service with the board. Letters written and received by him extending up to July, 1910, prove his familiarity with and sanction of the work of destruction. Several witnesses identify his presence at several places directing operations where explosions subsequently occurred, and we believe that complicity therein may justly be inferred from the circumstances in evidence, together with his own testimony.

The assignments on behalf of plaintiff in error Barry are overruled and the judgment against him must be affirmed.

8. Plaintiff in error Charles N. Beum:

This plaintiff in error resided at Minneapolis and became a member of the executive board of the association in September, 1909, serving for about one year thereafter and considerable of the expenditures in question were audited and allowed during his service, which included service as a member of the auditing committee. His correspondence with McNamara and others in evidence shows his acquaintance with and activity in the purposes of the conspiracy, and we believe authorized inference of his complicity therein.

The assignments on behalf of plaintiff in error Beum are overruled and the judgment against him must be affirmed.

9. Plaintiff in error Henry W. Legleitner:

This plaintiff in error resided at Pittsburgh (which was the scene of various explosions in evidence) and was a member of the executive board throughout. He was also active in visiting various localities where explosions subsequently occurred, and his correspondence with McNamara and others in evidence contains references thereto which plainly indicate his complicity. A witness testifies to the fact that Legleitner brought from Pittsburgh and delivered to John J. McNamara at Indianapolis one of the special carrying cases used for carrying nitroglycerin packages, as described in the evidence, and this carrying case was identified by McManigal as the one used by him for carriage of nitroglycerin on his trip to blow up the Llewellyn Iron Works at Los Angeles. The evidence referred to, together with his own testimony, authorized the inference of complicity charged in the indictment.

The assignments on behalf of plaintiff in error Legleitner are overruled and the judgment against him must be affirmed.

10. Plaintiff in error Ernest G. W. Basey:

This plaintiff in error was financial secretary and business agent of "Local No. 22" at Indianapolis and was constantly employed by the executive board or its auditing committee in examination of accounts of expenditures covering the period in question. Four explosions occurred in Indianapolis and the testimony tends to show his connection

with those explosions; that he made threats against the contractors who were engaged in the work as "open shop" concerns, and was present when John J. McNamara threatened them, just prior to the explosions, that "We are going to put you out of business"; that on Saturday night, just prior to the explosion, Basey stated in the presence of two of the workmen named, as follows, "Them sons of bitches won't work there on Monday morning"; also, that the day after the explosion Basey exclaimed, in presence of several witnesses, "I thought something like that would happen and it ought to happen." Two witnesses further testified that Basey stated to other independent contractors after the explosion, "You know what we done to Van Spreckelson," referring to the contractor whose work was destroyed. The testimony of another witness who was in the employ of Basey is of like effect as to his understanding that the explosions were to occur.

The assignments on behalf of plaintiff in error Basey are overruled and the judgment against him must be affirmed.

11. Plaintiff in error J. E. Munsey:

This plaintiff in error was also designated as "Jack Bright" in the testimony and resided at Salt Lake City. His participation with James B. McNamara in the explosions which occurred at Salt Lake City and complicity in other explosions appear from many circumstances in evidence and may justly be inferred from numerous letters sent by him to and received by him from John J. McNamara; also from an article published by him in the Official Magazine in the same issue containing an account of the explosions at Salt Lake City. He is clearly identified by one witness in conference with James B. McNamara, who caused the explosions referred to. He subsequently concealed James B. McNamara on his return from the coast after the fearful Times explosion which was caused by McNamara. We believe the identity of this plaintiff in error with the conspiracy and explosions to be well established.

The assignments on behalf of plaintiff in error Munsey are overruled and the judgment against him must be affirmed.

12. Plaintiff in error Peter J. Smith:

This plaintiff in error was business agent of "Local No. 17" at Cleveland, Ohio. Numerous explosions are in evidence which were within his field of activity and his direction and activity in producing the explosions appear from testimony, both direct and circumstantial. McManigal testifies to deliveries to him of nitroglycerin on two occasions, which were followed up by explosions, and he is identified by several witnesses in direct connection therewith. He is also well identified as the leader in numerous criminal acts in connection with the strike.

The assignments on behalf of plaintiff in error Smith are overruled and the judgment against him must be affirmed.

13. Plaintiff in error Paul J. Morrin:

This plaintiff in error was business agent of "Local No. 18" of St. Louis, and subsequently president of that local, and was constantly active in execution of the purposes of the International Association, and was expressly delegated by Ryan to look after matters at Mt. Ver-

non where an explosion occurred, although the explosion took place just prior to his visit. In connection with the fearful explosions which are in evidence as caused at Indianapolis, his correspondence with John J. McNamara in evidence clearly indicates his concurrence therein and in various subsequent explosions which occurred and are plainly referred to in the correspondence. His activity in the conspiracy cannot be doubted under the evidence and many of his admissions on the witness stand tend to support that view in connection with undisputed circumstances.

The assignments on behalf of plaintiff in error Morrin are overruled and the judgment against him must be affirmed.

14. Plaintiff in error William E. Reddin:

This plaintiff in error resided in Milwaukee and was in charge of operations of the association in that vicinity, and during his administration three explosions occurred in the state. McManigal testifies of his actual participation in two of these explosions, one at Milwaukee and the other at Superior. His correspondence with McNamara clearly points out his complicity in these explosions, aside from the direct testimony of McManigal of his part therein.

The assignments on behalf of plaintiff in error Reddin are overruled and the judgment against him must be affirmed.

15. Plaintiff in error Michael J. Hannon:

This plaintiff in error resided at Scranton, Pa., and was business agent of "Local No. 23" and was a member of the auditing committee of the International Association accounts in 1909 under a large salary. His letters in evidence contain repeated references to affairs which are "to come off" and of promise that "the goods will be delivered" when means are provided. In one letter to McNamara he says, "I am prepared to do anything, but you know how careful a man must be in a case of this kind." His explanations of these letters on the witness stand leave no room for doubt that he was actively engaged in the conspiracy.

The assignments on behalf of plaintiff in error Hannon are overruled and the judgment against him must be affirmed.

16. Plaintiff in error Murray L. Pennell:

This plaintiff in error resided at Springfield, Ill., and was active in that locality for the association, in connection with "Local No. 46" at that place. Two explosions occurred simultaneously at Springfield, which were caused by James B. McNamara. Pennell had previously demanded that the work be unionized where these explosions occurred. His previous correspondence with John J. McNamara of need for help in reference to "open shop" work that was going on there, and calling for the presence of "Brother Hockin," who was the manager of the work of explosions as hereinbefore stated, clearly authorizes inference, to say the least, that he was calling for the nefarious work which was subsequently carried out.

The assignments on behalf of plaintiff in error Pennell are overruled and the judgment against him must be affirmed.

17. Plaintiff in error W. Bert Brown:

This plaintiff in error resided at Kansas City and was business agent of "Local No. 10" when several explosions occurred (in 1909 and

1910) of "open shop" work in course of erection. His correspondence in evidence to and from J. J. McNamara and Ryan tends to show calls for action on the part of the International Association to prevent these works from going on; as expressed in McNamara's letter to Brown "to hinder their operations in every possible way." Two witnesses for the government, Charles Brown and Roy Cowan, testify to conversations with this plaintiff in error which clearly implicate the latter in the explosions which ensued, and their testimony, in connection with the letters and other circumstances in evidence, authorized submission of the issue as against him, notwithstanding the contention on his behalf that the witness Charles Brown was discredited "by witnesses introduced to impeach the story." The question of credibility of these witnesses was rightfully submitted for determination by the jury.

The assignments on behalf of plaintiff in error Brown are overruled and the judgment against him must be affirmed.

18. Plaintiff in error Edward Smythe:

This plaintiff in error resided at Peoria, Ill., and was business agent for "Local No. 112." The testimony which implicates him in the explosions in evidence of "open shop" bridge work at Peoria and East Peoria, in 1910—one caused by James B. McNamara and the other two by McManigal—impresses us to be overwhelming. It consists of voluminous correspondence with John J. McNamara, his personal attendance with the latter and Herbert S. Hockin when Hockin notified the General Manager of the Railway Company that their contractor for the bridge work "must employ union men on that job"; that if they did not "there was to be something doing. Something is going to happen." Soon after refusal to meet his demand the explosion was caused by James B. McNamara. In reference to the later explosions caused by McManigal, the latter testifies of Smythe's complicity therein; also, that Smythe attended with Hockin a meeting with contractors doing work at Newcastle, to arrange "for unionizing the job," and, when they so arranged, Hockin stated to the contractor, "You are now in no danger of any further explosions." Other evidence of complicity appears, but the above references suffice.

The assignments on behalf of plaintiff in error Smythe are overruled and the judgment against him must be affirmed.

19. Plaintiff in error George Anderson:

This plaintiff in error resided at Cleveland and was clearly identified by three witnesses as associated with the above-named plaintiff in error Peter J. Smith in his visit to North Randall, Ohio, when an explosion occurred there through the use of nitroglycerin, which the evidence tends to prove was the nitroglycerin delivered to Smith for such use by McManigal and Hockin. Other circumstances appear tending to show Anderson's complicity.

The assignments on behalf of plaintiff in error Anderson are overruled and the judgment against him must be affirmed.

20. Plaintiff in error Frank J. Higgins:

This plaintiff in error was designated as "special organizer for New England" of the International Association, and his activity in reference to the explosions which occurred in that region clearly appears from

the testimony and some of his letters in evidence; and one witness, Samuel Gallagher, a newspaper reporter, testifies to a conversation with Higgins in reference to the explosion that had occurred at Springfield in the work of the municipal tower, in which Higgins stated, "The explosion that took place at the tower cost our Union $300," and he further said:

"I went to Hartford the day before the explosion in order to prove an alibi if I should be charged with this depredation. It is likely, too, that Young went away on his trip, so that he would be in a position to prove an alibi. The party that actually produced the explosion immediately went west."

We believe the testimony and circumstances in connection therewith clearly authorized submission as against him.

The assignments on behalf of plaintiff in error Higgins are overruled and the judgment against him must be affirmed.

21. Plaintiff in error Frank K. Painter:

This plaintiff in error was president of "Local No. 21" at Omaha, Neb., and was also its business agent. His correspondence with McNamara shows his part in the explosions which occurred at Omaha and his association with Hockin in reference thereto. He took part in the threats to compel the work on the court house to be unionized and his complicity in the explosion which subsequently occurred may well be inferred from all the circumstances; also his complicity in another explosion directed against the Wisconsin Bridge Company. We believe the testimony to be ample for submission against him.

The assignments on behalf of plaintiff in error Painter are overruled and the judgment against him must be affirmed.

22. Plaintiff in error Fred J. Mooney:

This plaintiff in error was financial secretary of "Local 32" of Duluth, Minn., during the time that explosions occurred at Superior, Wis., and Green Bay, Wis., which were within his sphere of activity. His letter to McNamara on the day following the explosion at Superior reads:

"We had some real dynamiters here. Not the kind we had a year ago, but the real thing was done. The damage was not great but it was luck the leg landed where it did; otherwise the bridge would have come down which would have been large damage. I am inclosing clippings."

In another letter to McNamara, he says, "I cannot see where we are going to win unless we try some new tricks." His participation in the conspiracy may well be inferred from the letters and circumstances in evidence.

The assignments on behalf of plaintiff in error Mooney are overruled and the judgment against him is affirmed.

23. Plaintiff in error William Shupe:

This plaintiff in error resided at Chicago and was business agent of "Local No. 1," and at all times in question active in the proceedings of the International Association, as shown by the testimony and by his correspondence with Ryan in evidence. In reference to an explosion caused by McManigal between Pine and Gary near Chicago, McManigal was sent by McNamara for that purpose, with

directions to obtain instructions from Shupe about the location of the job. McManigal testifies that he called on Shupe who described the location to him; that he (McManigal) returned to Indianapolis to obtain his explosives and came back to Chicago, but was at a loss to fix the location, and again called upon Shupe and one Coughlin, when he obtained the information and exploded the works. We believe this testimony to be sufficiently corroborated by various undisputed circumstances to authorize the submission as against Shupe.

The assignments on behalf of plaintiff in error Shupe are overruled and the judgment against him must be affirmed.

24. Plaintiff in error Michael J. Cunnane:

This plaintiff in error resided at Philadelphia and was business agent of "Local No. 13," and his correspondence with McNamara establishes his activity in the matters of the conspiracy. He received from McNamara a check of $500 for use in response to his calls for money, and attached to his request were newspaper clippings showing an explosion. An explosion occurred at Philadelphia, January 22, 1909, of "open shop" work going on at "Pier No. 46." On January 29, 1909, Cunnane replied to a request of McNamara, "What has been done with the $500 donation made to No. 13?" as follows: "The money sent to Philadelphia was spent in fighting scab labor and more too. How do you like that"? Attached to this was a newspaper clipping giving an account of the explosion on "Pier No. 46." Other circumstances appear proving his activity in reference to explosions, and we believe the evidence authorized submission to the jury.

The assignments on behalf of plaintiff in error Cunnane are overruled and the judgment against him must be affirmed.

The plaintiffs in error not embraced in the foregoing recitals and conclusions are the following named: (1) Olaf A. Tveitmoe, (2) William J. McCain, (3) James E. Ray, (4) Richard H. Houlihan, (5) Fred Sherman, and (6) William Bernhardt.

On investigation of the testimony and circumstances pointed out by counsel for the government for upholding the convictions respectively of these last-named plaintiffs in error, we are of opinion that the evidence is insufficient to establish a prima facie case of copartnership in the offenses charged in the indictment, as against any of them. All except Tveitmoe were affiliated with the International Association, as officers or members of local organizations, and their sympathy and participation in its general objects and policies may rightly be assumed from the evidence, but we are not advised of proof to charge any thereof with actual participation in the conspiracy for commission of offenses averred in the indictment.

In reference to Tveitmoe, the fact that he was not a member of the association is, of course, not of controlling import. Nor, on the other hand, can the evidence of his undoubted sympathy with and co-operation in the great strike, nor any leading part therein in California which does not involve complicity in the averred conspiracy, serve to uphold his conviction, without evidence of his personal identification with that conspiracy. So, neither the fact nor the concession of counsel for plaintiffs in error, that "Tveitmoe was active and

a leader in local controversies going on in California," and that "naturally he earnestly and unceasingly desired a union victory," can be regarded as prejudicial for the present inquiry. Review of the extended references to the testimony presented on the part of the government is not deemed essential, beyond the statement that no competent testimony appears therein to identify Tveitmoe with complicity in any offense charged in the indictment. The testimony of McManigal of references by McNamara to Tveitmoe as the "old man of the coast," who wanted "a Christmas present and that he had agreed to give him one," is not competent for his identification with the conspiracy, as the statement of a co-conspirator, in the absence of proof to establish Tveitmoe as a conspirator; and McManigal had no meeting with him at any time. It is true that a letter appears in evidence from Tveitmoe to McNamara, dated December 19, 1910, which closes with this expression:

"Trusting Santa Claus will be as kind and generous to you with surprises and presents of the season, as he is to us in the Golden State, we beg to remain."

But neither the context thereof nor circumstances in evidence are indicative of reference therein to matters involved in the charges.

The testimony cited against the other plaintiffs in error above mentioned as not chargeable does not require specification, as we believe, except in reference to Ray and Sherman. In each of these cases we have found cause for hesitation upon the issue of identity. The testimony shows that Ray was present with Edward Smythe (both of Peoria) at the meeting in which Hockin notified the General Manager of the railway company that "something is going to happen," if union labor is not employed for the job, as above mentioned in reference to Smythe. In respect of Sherman the testimony shows that he was business agent of Local No. 22 at Indianapolis and that he visited French Lick Springs and notified the contractor engaged in work upon the hotel: "You will have to use union labor here"; and again urged such employment at a later meeting. About two weeks thereafter a dangerous explosion was produced by James B. McNamara, destroying much of the work and placing the lives of many persons in the hotel in great peril. Examination of the further testimony offered against one and the other of these parties discloses no evidence otherwise of complicity in the explosion which ensued, nor of activity or complicity in other operations of the conspirators, so that our conclusions are that the circumstances referred to, although they may well arouse suspicion, are insufficient to charge either party as a conspirator for commission of the offenses in question.

In conformity with the foregoing view, the judgments respectively against the plaintiffs in error Tveitmoe, McCain, Ray, Houlihan, Sherman, and Bernhardt must be reversed.

The judgments respectively, therefore, against the plaintiffs in error Ryan, Clancy, Young, Webb, Cooley, Butler, Munsey, Barry, Smith, Beum, Leglcitner, Basey, Morrin, Reddin, Hannon, Pennell, Brown, Smythe, Anderson, Higgins, Painter, Mooney, Shupe, and Cunnane are each hereby affirmed.

The judgments respectively against the plaintiffs in error Tveitmoe, McCain, Ray, Houlihan, Sherman, and Bernhardt are each reversed, and the cause in respect of each thereof is remanded to the District Court for a new trial as to each such defendant below.

## On Rehearing.

Before BAKER, SEAMAN, and MACK, Circuit Judges.

On petition of the defendant in error rehearing has been granted in the above-entitled cause, upon the several writs of error therein brought by the plaintiffs in error Olaf A. Tveitmoe, Richard H. Houlihan and William Bernhardt, and the conclusions of this court on the original hearing reversing the judgment against each of such plaintiffs in error, for cause stated in the opinion, and remanding as to each thereof for a new trial.

SEAMAN, Circuit Judge. Rehearing having been concluded upon the evidence applicable respectively to the plaintiffs in error Olaf A. Tveitmoe, Richard H. Houlihan and William Bernhardt, we are of opinion that no change or modification of our former rulings is authorized as to plaintiffs in error Tveitmoe or Houlihan.

In the case of Tveitmoe, the circumstances relied upon for support of the charges—together with his letter of December 19, 1910, containing the mention of "Santa Claus" and "surprises and presents of the season," referred to in our original opinion—are not connected by the evidence with any circumstance tending to prove his violation of the federal statute as charged, and we believe no comment to be proper upon their alleged tendency to prove complicity in the Los Angeles outrages of October 1, 1910, wherein no interstate transportation of explosives was involved under the evidence. Without facts of probative force to establish this missing link—for which grounds for mere suspicion cannot serve as proof—the charges in question are unsupported. So, while the above-mentioned expressions in Tveitmoe's letter of December 19th may well be understood as referring to the antecedent course of strife and attendant explosions "in the Golden State," within his jurisdiction and knowledge, they are neither applicable in terms as referring (by way of anticipation) to the ensuing explosion at the Llewellyn Iron Works, in Los Angeles, December 25, 1910, caused by McManigal under the International Association conspiracy charged, nor is the contention supported by evidence, that such occurrence was "anticipated by the writer for Christmas." No proof appears direct or circumstantial, that he was then advised or had reason to believe, that such explosion was either intended by the conspirators, or planned as a "Christmas present," or that any hostile act against open shop concerns was to be accomplished by means in violation of the federal statute.

The contentions of sufficiency of proof against Houlihan are, in substance: (a) That he was "financial secretary" of Local No. 1, Chicago, whereof Ryan and McManigal were members; (b) that McManigal (codefendant) testifies to payment of money for his crim-

inal services received from Houlihan inclosed in an envelope, and of conversations between them tending to prove complicity on the part of Houlihan, in each particular controverted by the accused as a witness; (c) that Local No. 1 contributed $25 per week for the benefit of the wife of McManigal, after the arrest of her husband, and the payments were made by Houlihan. We believe each of these propositions to be without force to uphold conviction. Plainly neither the first nor the last-mentioned circumstance, without other proof of complicity, lends support to the charge. His payments to Mrs. McManigal (if otherwise reprehensible) appear alone as contributions by Local No. 1, through the hands of Houlihan as its financial secretary, and in no sense as his personal contributions. The question of sufficiency, therefore, must hinge on the legal effect of the testimony of McManigal, as above stated, to establish the charge against Houlihan. It appears (and is conceded as well) that such testimony stands without corroborative evidence, either as to the transaction with Houlihan or the several conversations with him, and it is thus brought within the rule (stated and recognized in the original opinion) which renders the testimony insufficient. The fact that McManigal was corroborated in other testimony affecting other defendants cannot cure the infirmity of the instant testimony under such rule.

Pursuant to the foregoing conclusions, the orders heretofore pronounced in favor of the plaintiffs in error Tveitmoe and Houlihan stand undisturbed on rehearing.

In the case of the plaintiff in error William Bernhardt, evidence in the record of undoubted probative force is brought to our consideration, which escaped notice in reviewing the evidence applicable to the charges against him. While the leading correspondence (hereinafter mentioned) between Bernhardt and J. J. McNamara was then examined, together with a great array of testimony as to explosions caused at Dayton and Cincinnati, referred to in support of the charges, it was not understood that competent proof appeared of Bernhardt's complicity in any of these explosions, or other offenses committed by the conspirators. In the light, however, of pertinent and cogent facts in evidence advanced upon rehearing, we are constrained to believe that our ruling for reversal upon such review was not well advised and requires correction.

Bernhardt was financial secretary of Local No. 44 of Cincinnati, Ohio, from March, 1907, until August, 1910, and his activity there in furtherance of the great strike and intimate association therein with his codefendant, Edwin Clark, "business agent" of the local, are established facts. On October 22, 1907, Bernhardt's letter to J. J. McNamara, reporting upon matters at Cincinnati, contains the following references to the Grainger Company, then engaged in work there on the "open shop" plan in the erection of "Harrison Ave. viaduct":

"The traveler was turned over on the Grainger job, one killed and one injured they accused the bridgemen of putting acid on the lines of cables which they claimed caused the wreck. Some of our members have been arrested twice for a little skirmish which we succeeded in getting them out of it. I have footed several of the bills personally, as it could not be brought up. * * * I will state from the information I can get, the Grainger is getting

kind of wobbly on his pins. about this job and ain't far from throwing up.. Now if some stranger could come around the back way on the Q. T. and ditch the balance the jig is up. * * * The police judge said, 'For God's sake don't come around again with that bunch or I will have to do something.' "

Again, on October 21st, Bernhardt wrote to McNamara of delays and trouble brought about in Grainger's work, "so at present * * * it would be a waste of time and money to have some one down on business."

On February 15, 1908, Bernhardt wrote to J. J. McNamara:

"I wish to inform you that Brother Edw. Clark, Bus. agent of Local 44 has been instructed to appear before the board by Local 44 to explain our situation here. There may be several items that would not do to put in writing. So anything that may or can be done for the best interests of this locality will be appreciated very much."

Pursuant to this letter, Clark reported in person to McNamara and was informed by the latter that Hockin would be sent to Cincinnati to investigate matters; and McNamara notified Bernhardt, in letters dated February 28th and 29th, of such arrangement, which was carried out by Hockin in March, in an address before Local 44 and in an agreement between Clark and Hockin, performed by Clark, to dynamite work of the American Bridge Company at Dayton, which Hockin said was more important "than the Grainger job, because Grainger was a small fellow." Although Bernhardt states in his testimony that he had a brief interview with Hockin on that visit, he denies any information of the conspiracy, and no direct evidence of his participation appears. Clark, who testified at length on behalf of the government in reference to all of the above-mentioned transactions, neither names nor implicates Bernhardt therein. But on March 14, 1908, Bernhardt received a letter from McNamara which contains the following remarks plainly directed to the Hockin conference:

"* * * Brother Hockin was at headquarters and he reports to me relative to conditions at Cincinnati and Hamilton. Relative to the latter place, wish to say I am under the impression that this job is worth going after and I believe that the executive board of 44 should take same in hand and make an effort to control it.

"While I do not approve of the local union going on record as being in favor of any proposition that is not strictly O. K. I am in favor of the executive board of any organization taking a job in hand and trying out temporary arrangements. My experience has been that these are in a great many instances successful. It would be well for you to take this matter up with Brother Clark and also with the executive board of 44. I am referring Brother Hockin's recommendation to President Ryan and shall write you as soon as I hear from him."

Thus the only direct evidence of the discussion and arrangement of matters of the alleged conspiracy, both with McNamara at Indianapolis and by Hockin at Cincinnati, appears in the testimony of Clark, the codefendant, so that were the contention on behalf of Bernhardt well founded, that no independent proof is furnished of overt acts under such conspiracy which may be attributable to invitations or suggestions contained in his above-mentioned letters, it may be conceded that failure of such proof would constitute ground for reversal.

But that contention is plainly untenable under the further facts established by the evidence.

The work of the Grainger Company on the Harrison avenue viaduct in Cincinnati (referred to in Bernhardt's letters) was destroyed by explosion caused by the conspirators in August, 1908; and this was followed by other like explosions in Cincinnati of "open shop" work of the Pittsburgh Company. Proof is abundant that each of these explosions was so caused in furtherance of the conspiracy in evidence, both direct and circumstantial, and does not rest on the testimony of the perpetrators as accomplices therein. For instance, the testimony of the witness Frank Eckhoff furnishes both competent and convincing evidence of this purpose and performance. That the Grainger explosion first mentioned was within the meaning and object of Bernhardt's letters to McNamara cannot be doubted under the uncontroverted facts, and their attempted explanations otherwise by Bernhardt, as a witness for the defense, may well have been rejected by the jury as unreasonable and frivolous.

We are therefore impressed with no doubt of the sufficiency of evidence for support of the conviction of the plaintiff in error William Bernhardt. The order heretofore granted for reversal of the judgment against him and remand of the cause is set aside, and instead thereof it is further ordered that such judgment be affirmed.